# In the United States Court of Federal Claims

|  |  |
|---|---|
| KAYHAN SPACE CORP.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 25-cv-104<br><br>Filed Under Seal: May 28, 2026<br><br>Publication: June 8, 2026[1] |

*Anuj Vohra* of Crowell & Moring LLP, Washington, D.C. argued for Plaintiff. With him on the briefs were *Eric M. Ransom*, *Roxanne N. Cassidy*, and *Emily P. Golchini* of Crowell & Moring LLP, and *Jonathan D. Perrone* and *Joshua M. Sather* of Centre Law and Consulting, LLC.

*Rebecca T. Mitchell* of the United States Department of Justice, Civil Division, Washington, D.C. argued for Defendant. With her on the briefs were *Brett A. Shumate*, *Patricia M. McCarthy*, *Corinne A. Niosi*, of the United States Department of Justice, Civil Division, Washington, D.C., and *Siobhan K. Donahue* and *Sanique J. Balan* of the United States Department of the Air Force.

## MEMORANDUM AND ORDER

Preserving our Nation's security is of paramount importance, including in government contracting and in making federal grants. Recognizing the significance of national security, in September 2022, Congress enacted the SBIR and STTR Extension Act of 2022, Pub. L. No. 117-183 (SBIR Extension Act), which included enhanced national security due diligence requirements for the Small Business Innovation Research (SBIR) and Small Business Technology Transfer (STTR) programs. Specifically, section 4(b) of the SBIR Extension Act mandates federal agency review of SBIR and STTR contract and grant applications for potential national security threats.

---

[1] This Memorandum and Order was filed under seal on May 28, 2026, in accordance with the Protective Order entered in this case. *See* ECF No. 8. On June 4, 2026, the parties filed a Joint Notice proposing redactions to the Memorandum and Order. The sealed and public versions of this Memorandum and Order are identical, except for redactions, this footnote, and the addition of the publication date.

On May 13, 2024, then-Deputy Secretary of Defense[2] Kathleen Hicks, the second-highest ranking official in the Department of Defense (DoD), issued a memorandum implementing the SBIR Extension Act for the DoD and subordinate agencies. Administrative Record (AR) at 438 (Hicks Memo). On February 25, 2025, the Department of the Air Force (Air Force) created its own guidance to implement both the SBIR Extension Act and the Hicks Memo. AR at 504.

The present suit relates to the denial of an SBIR award under the enhanced due diligence required by the SBIR Extension Act, as implemented by the Hicks Memo and Air Force policy. Plaintiff Kayhan Space Corporation (Plaintiff or Kayhan) challenges its denial from Air Force Solicitation number AFX 23.8, Commercial Solutions Opening Topic AFX238-DPCS01 (Solicitation). The Solicitation sought to fund research projects that, if successful, could enable the United States Space Force[3] (Space Force or USSF) to "rapidly respond to on-orbit needs on operationally relevant timelines." AR at 42. In its submission for the contract award, Kayhan proposed software that is designed to deconflict space launches, so that rockets can safely travel from the ground past the atmosphere. AR at 107. The Air Force rejected Kayhan's proposal as a national security risk under the enhanced due diligence standards of the SBIR Extension Act. *Id.* at 273. The Air Force avers that during its national security review it discovered that two Kayhan

---

[2] Subsequent to the events underlying this action, President Trump renamed the "Department of Defense" the "Department of War." Executive Order 14347, 90 Fed. Reg. 43893 (Sep. 10, 2025). As the record in this action pre-dates the Executive Order and uses the term "DoD", this Memorandum and Order accordingly references the terms "Department of Defense" or "DoD" for consistency with the record. ECF No. 24 (filing the original Administrative Record on March 12, 2025).

[3] The United States Space Force is "an armed force within the Department of the Air Force." 10 U.S.C. § 9081(a). The Space Force must "(1) provide freedom of operation for the United States in, from, and to space; (2) conduct space operations; and (3) protect the interests of the United States in space." *Id.* § 9081(c). The Air Force issued the Solicitation to provide capabilities for the Space Force. AR 42. The Department of the Air Force is itself a Component of the Department of Defense. 10 U.S.C. § 111(b)(8).

executives—the co-founders of the company—had ties to Iran. *Id.* at 571. Each attended an educational institution linked to Iran's Islamic Revolutionary Guard Corps (IRGC), and one subsequently worked for an entity linked to the IRGC. *Id.* As a result of its national security review, the Air Force determined that if it were to award Kayhan the contract, these alleged connections to the IRGC would pose a national security threat to the United States and that mitigation of the risk posed by such connections was not possible. *Id.* at 571–72. For these reasons, the Air Force declined to award the contract to Kayhan. *Id.* at 572.

Plaintiff moves for this Court to set aside the Air Force's determination that Kayhan poses a national security risk. Specifically, Plaintiff argues that (i) the Air Force's risk assessment was arbitrary and capricious because it lacked a reasonable basis, (ii) the Air Force failed to follow procedure, and (iii) the Air Force has de facto debarred Kayhan from future Air Force contracts while evading the formal debarment process. ECF No. 41 (Plaintiff's Motion for Judgment on the Administrative Record or Pl. MJAR) at 7. Plaintiff alleges that the Air Force has relied upon the non-selection decision challenged here as a basis to deny it an award in at least one other procurement. In contrast, Defendant contends that the Air Force made a rational determination according to proper procedure and has not de facto debarred Plaintiff. ECF No. 53 (Def. MJAR) at 9–10. Defendant also asserts that Plaintiff should not be allowed to supplement the record.

The Court agrees with Defendant. As detailed further below, the Air Force properly documented and justified its determination that, in its view, an award to Kayhan would pose a national security risk because of its co-founders' links to Iran. The Air Force followed applicable statutes and regulations when it made this determination, and the Air Force's determination here does not systemically prevent Plaintiff from winning other contracts, as must be demonstrated to succeed on a de facto debarment claim.

Finally, Plaintiff seeks to supplement the Administrative Record with affidavits from its executives, who assert both that Kayhan does not pose a security threat and that the Air Force has systematically denied Kayhan contracts.  ECF No. 56 (Pl. Mot. to Suppl.).

For the reasons below, the Court grants Plaintiff's Motion to Supplement in part as it relates to Plaintiff's de facto debarment claim but otherwise denies Plaintiff's attempt to add documents to the Administrative Record that were never before the Air Force during the procurement process. Plaintiff may not supplement the Administrative Record with evidence relevant to the merits of the Air Force's determination; it may supplement the Administrative Record with evidence related to its claim of de facto debarment.  Accordingly, the Court **DENIES** Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 41), **GRANTS** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 53), and **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion to Supplement the Administrative Record (ECF No. 56).

## BACKGROUND

### I.    Plaintiff's Business

Kayhan is a small business headquartered in Colorado, with the mission "to make Spaceflight Safer™ by building next-generation autonomous spaceflight safety capabilities."  ECF No. 25 (Amended Complaint) ¶ 16.  Kayhan offers a launch collision avoidance platform, called "Gamut," which "aid[s] in the deconfliction of air, maritime, and space traffic."  *Id.* ¶ 34.  Kayhan describes Gamut as a "high-performance launch [conjunction assessment] software that assesses the collision risk of launch trajectories in record time."  *Kayhan Space Capabilities White Paper*, Kayhan  Space,  https://science.nasa.gov/wp-content/uploads/2024/03/nasa-planetary-mission-technology-showcase.docx.pdf (last visited May 16, 2026).  The company explains that:

4

> Gamut is a Launch Conjunction Assessment [] system that enables launch providers to rapidly identify conjunctions along a launch vehicle's predicted trajectory with other objects in the space environment. Gamut screens each individual launch time option in your launch window to make it easy [to] identify which launch times produce close approaches.

*Gamut*, Kayhan Space, https://app.kayhan.io/docs/gamut/ (last visited May 16, 2026). The Gamut software is designed to allow a spacecraft to be "safely and rapidly launched to an intercept trajectory," so that other Kayhan software can guide spacecraft "to intercept the target object." *Kayhan Space Capabilities White Paper*, Kayhan Space. Essentially, the software at issue here helps spacecraft launch on short notice and reach their target destinations without any unwanted collisions. *See id.*

Kayhan's founders, Siamak Hesar and Araz Feyzi (collectively, Kayhan founders), are naturalized U.S. citizens who immigrated from Iran on January 12, 2005, and June 13, 2006, respectively. Am. Compl. ¶ 23. Mr. Feyzi's parents remain in Iran, ███████████ ████████████████████████████████████████████ ██████████████. *Id.* & n.3. At the time that the Air Force first denied Kayhan the contract at issue, Mr. Hesar's parents lived in Iran, although Plaintiff notes they have since immigrated to the United States. *Id.* at n.3. Otherwise, Kayhan contends that neither founder has any "affiliations with or relationship to the country of Iran, the Iranian Government, or Iranian entities." *Id.* ¶ 23.

## II.    **The SBIR Due Diligence Program**

Congress created the Small Business Innovation Research (SBIR) program so that agencies would provide grants and contracts to "small-business concerns to enable them to undertake and to obtain the benefits of research and development in order to maintain and strengthen the competitive free enterprise system and the national economy." 15 U.S.C. § 638(a). Federal agencies spent $4.4 billion on SBIR contracts and grants in fiscal year 2022, the most recent year

for which data is available.  Marcy Gallo, Cong. Res. Serv., *Small Business Research Programs* (Dec. 15, 2025), https://www.congress.gov/crs-product/IF12874.

### A.  Congress Passes SBIR Extension Act

In September 2022, the SBIR Extension Act became law.  Pub. L. No. 117-183, 136 Stat. 2180, amending 15 U.S.C. § 638.  The SBIR Extension Act created a new SBIR/STTR "Due Diligence Program to Assess Security Risks" (SBIR Due Diligence Program).  Pub. L. No. 117-183, sec. 4(b), codified at 15 U.S.C. § 638(vv).  Congress recognized that "foreign adversaries have been exploiting the SBIR [program] through shell companies, planted government research, and state-sponsored talent programs."  168 Cong. Rec. H8133 (daily ed. Sep. 28, 2022) (statement of Rep. Blaine Luetkemeyer).  Accordingly, through the SBIR Extension Act, Congress directed each agency making SBIR awards to assess national security risks from small businesses.  *See* 15 U.S.C. § 638(vv).

The SBIR Due Diligence Program requires agencies "to assess security risks presented by small business concerns seeking a federally funded award."  15 U.S.C. § 638(vv)(1).  Specifically, each agency shall:

> (A) assess, using a risk-based approach as appropriate— (i) the cybersecurity practices of a small business concern; (ii) patent analysis; (iii) employee analysis; (iv) foreign ownership of a small business concern seeking an award, including the financial ties and obligations (which shall include surety, equity, and debt obligations) of the small business concern and employees of the small business concern to a foreign country, foreign person, or foreign entity; . . .
>
> (B) assess awards and proposals or applications, as applicable, using a risk-based approach as appropriate, including through the use of open-source analysis and analytical tools, for the nondisclosures of information required under (g)(13).

15 U.S.C. § 638(vv)(2).  In turn, an agency making SBIR awards "shall" require small businesses submitting "a proposal or application for a federally funded award to disclose in the proposal or application" certain foreign connections.  15 U.S.C. § 638(g)(13).

6

The SBIR Extension Act also added a new definition of "foreign country of concern" to the enabling statute for the SBIR program. Pub. L. No. 117-183, sec. 4(a)(3), codified at 15 U.S.C. § 638(e)(17). Iran is a specified foreign country of concern, alongside China, Russia, and North Korea. *Id.*

Furthermore, the SBIR Extension Act includes a "Rule of Construction," stating that nothing in subsection (vv) of 15 U.S.C § 638 "shall be construed to . . . (B) restrict any Federal agency from taking due diligence measures *in addition to* those required under such subsection (vv) at the Federal agency." Pub. L. No. 117-183 sec. 4(b)(5), 136 Stat. at 2183, codified at 15 U.S.C. § 638 note (2022) (Rule of Construction) (emphasis added).

### B. DoD Implements the SBIR Extension Act

On May 13, 2024, following the enactment of the SBIR Extension Act of 2022, then-Deputy Secretary of Defense Kathleen Hicks issued the Hicks Memo, which announced the DoD's implementation of the SBIR Due Diligence Program entitled the "Defense Small Business Innovation Research and Small Business Technology Transfer Due Diligence Program" (DoD Due Diligence Program). AR at 438. The Hicks Memo established "common minimum standards" that must be "applied consistently across all DoD Components that make SBIR or STTR awards." *Id.* To ensure the DoD applied this minimum standard across components, the Hicks Memo included a "Common Risk Matrix," which mandated assessment factors for "DoD Components [to] follow" as they implemented their component-specific due diligence programs. *Id.*; *see* AR at 446–453 (Common Risk Matrix).

As stated in the Hicks Memo, the Memo "and its associated attachments establish [DoD] policy and provide implementation guidance for the Defense SBIR and STTR Due Diligence Program. This program will assess and mitigate security risks presented by small business

7

concerns [(SBCs)] in accordance with the SBIR and STTR Extension Act of 2022." AR at 438 (citing SBIR Extension Act). The stated purpose of the DoD Due Diligence Program is to "mitigat[e] security risks presented by SBCs with ties to a foreign country of concern seeking an SBIR or STTR award." *Id.* Each SBIR or STTR applicant must submit a foreign disclosure form at the time of proposal submission, and the awarding agency completes a business review. AR at 440. Following the business review, a "security risk indicator report" is generated and "provided to the DoD Component's SBIR or STTR program office to which the SBC applied. DoD Components will use the business security risk indicator report in their due diligence review to assess security risks." AR at 442.

The DoD Due Diligence Program places certain minimum obligations on the DoD Component to which the proposal was submitted. See AR at 438, 442. First, the DoD Component must review and analyze the foreign disclosure form and attempt to ascertain whether the business failed to disclose any relevant information. AR at 443. Second, the DoD Component must "[c]ompar[e] . . . the SBC's foreign disclosure form and the business security risk indicator report . . . to the [five] factors [included in the Hicks Memo] to assess the SBC's risk and if mitigation measures for the SBC are suggested, recommended, or required." *Id.* Third, the DoD Component must complete a written assessment. AR at 443. "If an SBC is assessed as being low risk for all the risk factors [in the Hicks Memo] . . . the DoD Component will complete the source selection, negotiation, and award process for SBIR and STTR awards for the SBC without further security review." *Id.*

The Hicks Memo identifies five factors in the Common Risk Matrix: Factor 1, Foreign Talent Recruitment Program; Factor 2, Foreign Ownership/Control; Factor 3, Foreign Patents, Intellectual Property, and Technology Transfers; Factor 4, Financial Obligations; and Factor 5,

8

Foreign Affiliations.  AR at 447.  Factors 2 and 5 are relevant to the present action and are defined as follows:

**Factor 2, Foreign Ownership/Control**:

Prohibited Factors:    The DoD is prohibited from making an award to an SBC with the factors set forth in 15 U.S.C. 638(g)(15)(B).

Very High Risk:    None.

High Risk:    Undisclosed indicators that a business entity, parent company, subsidiary, joint venture, or a controlling general partner maintains an affiliation with an individual, an institution, or a controlling equity held in an FCOC [(Foreign Country of Concern)], which interferes with the capacity for activities supported by the DoD to be carried out, present concerns about conflict of interest (CoI), or pose a risk to national security.

Medium Risk:    Disclosed indicators that a business entity, parent company, subsidiary, joint venture, or a controlling general partner maintains an affiliation with an individual, an institution, or a controlling equity held in an FCOC, which present concerns about CoI or creates duplication with activities supported by the DoD.

Low Risk:    No indicator(s) that a business entity, parent company, subsidiary, or joint venture is or was owned by, based in, located in, or had a general partner with an affiliation with an FCOC.

**Factor 5, Foreign Affiliations**:

Prohibited Factors:    The DoD is prohibited from making an award to an SBC with the factors set forth in 15 U.S.C. 638(g)(15)(B).

Very High Risk:    Indicator(s) <u>disclosed</u> in the SBC's proposal or foreign disclosure form that an individual with significant influence over the SBC's operations has affiliation with an entity or research institution in an FCOC.

High Risk:    None.

Medium Risk:    **For the period after 10 Oct 2019:**

> Covered individual's co-author(s) on publications in science and engineering (S&E) journals is/are affiliated with an entity on: the U.S. BIS Entity List, the Annex of EO 14032 or superseding Eos [sic], Sec. 1260H of the NDAA for FY 2021, or Sec. 1286 of the NDAA for FY 2019, as amended.
>
> **OR:**
>
> Covered individual is a co-author on a publication in an S&E journal with a person on the U.S. BIS Denied Persons List.

Low Risk:         No indicator(s) that an owner or covered individual has an active affiliation with a foreign entity or research institution in an FCOC.

AR at 447–49.  The Common Risk Matrix also defines key terms used:

> **Affiliation**: Academic (not including undergraduate or graduate students), professional, or institutional appointments or positions with a foreign government or a foreign government-connected entity, whether full-time, part-time, or voluntary (including adjunct, visiting, post-doctoral appointment, or honorary), where monetary reward, non-monetary reward, or other quid-pro-quo obligation is involved.
>
> **Association**: Academic (not including undergraduate or graduate students), professional, or institutional appointments or positions (including adjunct, visiting, voluntary, post-doctoral appointment, or honorary) with a foreign government or a foreign government-connected entity where no monetary reward, non-monetary reward, or other quid-pro-quo is involved.
>
> **Security Risks**: Risks to DoD funded SBIR or STTR research that are related to cybersecurity practices, foreign patents, employee affiliations or associations and those risks posed by foreign ownership, financial ties, and obligations of the small business concern and/or its employees to a foreign country, foreign person, or foreign entity.

AR at 450, 453.

As noted, the DoD Due Diligence Program includes the Common Risk Matrix because the DoD Due Diligence Program is designed to apply across all DoD Components, so a common standard is necessary.  *See* AR at 438.  Each DoD Component's due diligence program is required "[a]t a minimum" to submit "[a]n analys[i]s of the foreign disclosure form submitted by the SBC,"

10

compare the information therein to open-source information, and apply all that information to the Common Risk Matrix. AR at 442, 443.

Finally, the DoD Due Diligence program requires that each DoD Component establish a "risk mitigation review board" to "determine what level(s) of risk, with or without mitigation, are acceptable for its SBIR and STTR awards." AR at 444. This risk mitigation review board reviews the written assessment and develops a recommendation regarding risk mitigation, such as, for example, whether it is possible to move forward with an SBC's proposal. *Id.*

### C. The Air Force Implements the SBIR Extension Act

On February 25, 2025, after the DoD implemented the SBIR Extension Act through the Hicks Memo, the Department of the Air Force established its own guidance implementing the SBIR Due Diligence program and the DoD Due Diligence Program. AR at 504 (Air Force Instruction 61-102 or AFI 61-102). Specifically, the new guidance amended Air Force Instruction 61-102 to implement the SBIR Extension Act and the DoD Due Diligence Program. *Id.* AFI 61-102 now states that "[i]n consideration of the significant national security risks inherent in small business concerns, persons, or entities with ties to foreign countries of concern," the Air Force will "utilize all available means, consistent with applicable United States law and policy, to safeguard potential [Air Force] investments, including, but not limited to, the factors required by the [DoD Due Diligence Program]." AR at 506.

AFI 61-102 establishes a procedure for the Air Force to convene a risk mitigation review board (RMRB) in order to implement the due diligence review process. AR at 510. Each RMRB has the power to determine whether an applicant poses a national security risk:

> The RMRB will determine whether a reasonable and articulable national security risk exists to Departmental or U.S. Government interests. This determination and justification will be articulated in writing if the RMRB makes a non-award decision or a decision that award must be conditioned on mitigation.

11

AR at 512.  The RMRB may consider a wide range of "Permissible Information," including information beyond what the SBIR applicant submitted to the Air Force:

> While conducting its review, the RMRB may consider any information available to the Board as permitted by law and policy, including by incorporating commercially available information, publicly available information, and U.S. Government data, including but not limited to Law Enforcement, intelligence, and counterintelligence information and analytic products, and any other agency-specific information, as appropriate. The RMRB will not consider any factors or grounds in violation or contradiction of law or policy, including prohibited factors listed in the [Hicks] Memo.

*Id.*

AFI 61-102 states that "risk determinations are inherently discretional judgements [*sic*] of military, national defense, and national security matters."  AR at 511.  These risk determinations "apply only to particular SBIR/STTR proposals or applications," and do not apply to other procurements: "such risk determinations do not constitute suspension or debarment under FAR subpart 9.4."  AR at 514.  Finally, AFI 61-102 affords due process to applicants and offerors.  *Id.* For example, the Air Force "must provide notice to the SBC of the denial/non-selection at the conclusion of RMRB proceedings."  AR at 515.  However, when the reason for denial or non-selection involves classified information, then the SBC will only be entitled to "an unclassified summary" of the information, which "should contain enough information for due process," "without disclosing sensitive sources and methods or any classified information."  *Id.*  AFI 61-102 states that "[c]lassified information will not be shared in whole or in part with any Applicant, or attorney representing applicant, whether or not either or any party is cleared."  *Id.*

### III.    Solicitation AFX 23.8

On August 30, 2023, the Air Force issued Solicitation No. AFX 23.8, Commercial Solutions Opening, Topic Number AFX238-DPCS01.  AR at 1, 4.  The Solicitation sought "innovative commercial technologies proposed to create new [Air Force] solutions or potential

12

new capabilities that fulfill requirements, close capability gaps, and provide potential technological advancements." AR at 6. Specifically, the Solicitation sought:

> the ability to rapidly respond to on-orbit needs on operationally relevant timelines. This rapid acquisition effort will use both commercial and government mission partners, such as commercial satellite providers and government-contracted launch services, during a conflict or a crisis to respond to threats or augment existing capabilities. Our mission is to reduce USSF [(Space Force)] response times from months or weeks to days or hours, having a significant impact on U.S. and ally resilience.

AR at 42. Issued under the SBIR Program, the Solicitation also indicated that the Air Force "will not make an award under the SBIR program if it determines that . . . the [applicant's] relationships and commitments . . . (iii) present concerns about conflicts of interests; (iv) were not appropriately disclosed to the DoD; (v) violate Federal law or terms and condition of contracts . . . ; or (vi) pose a risk to national security." AR at 32. According to the Solicitation, if the Air Force identified a security risk, the Air Force would "1) [c]reate a plan to mitigate the risk(s) or 2) [d]ecide not to select the proposal for award based upon the totality of the review." *Id.*

In response to the Solicitation, on September 27, 2023, Kayhan submitted proposal F2D-9750, proposing its launch collision avoidance platform, "Gamut." AR at 101, 107. On November 29, 2023, the Air Force congratulated Kayhan on its proposal's "tentative selection for negotiations and award." AR at 180. After notifying Kayhan of its tentative selection, the Air Force performed a due diligence review of Kayhan's proposal. AR at 183–244. Subsequently, on January 12, 2024, the Air Force declined to make an award to Kayhan and issued a written "Notice of Non-Selection of Proposal F2D-9750." AR at 273. The notice explained that the Air Force "determined that [Kayhan's proposal] presented security risks as discussed in 15 U.S.C. [§] 638(vv)(2)(A), and that the proposal should not be selected for award." *Id.*

13

## IV.    Agency-Level and GAO Protests

On January 17, 2024, Kayhan filed an agency-level protest of the denial with the Air Force. AR at 262–65.  On February 28, 2024, the Air Force denied Kayhan's agency-level protest based on a review of the "proposal package itself, including but not limited to the Disclosures of Foreign Affiliations," "[t]he correspondence between the Government and Kayhan," "[i]nternal documentation from decisionmakers within the Government regarding this proposal," "[a] [January 25, 2024] classified briefing . . . by the Air Force Office of Special Investigations," and a "classified report," which reflected the information presented in the briefing.  AR at 282–83. Both the classified briefing and classified report were classified as "SECRET//NOFORN."  AR at 283.  The denial of the protest concluded that "the proposal presented valid security risks as discussed in 15 U.S.C[.] [§] 638(vv)(2)(A)."  AR at 286.

Next, on March 11, 2024, Kayhan filed a protest at the Government Accountability Office (GAO).  AR at 287.  On April 1, 2024, the Air Force sent the GAO its Notice of Corrective Action. AR at 433.  The Air Force stated it would "re-evaluate Kayhan's proposal in accordance with Section 4 of the SBIR and STTR Extension Act of 2022 . . . and then make a new selection or non-selection decision."  *Id.*  Accordingly, on April 2, 2024, the GAO dismissed Kayhan's protest as academic.  AR at 435–36.

## V.    Post-GAO Corrective Action and Air Force Due Diligence Review Memo

While taking corrective action and pursuant to the due diligence process, the AFWERX Capital Initiatives Division (AFWERX), a division within the Air Force that conducts due diligence on SBIR proposals, conducted a review of Kayhan's proposal.  AR at 463, 483, 511. AFWERX prepared a "due diligence review memo" regarding Kayhan.  AR at 483–89. (Kayhan Due Diligence Review Memo).  The memo contains a "Sources" page, indicating the origin of the

14

supporting information.  AR at 488.  These sources consist of various public websites and social media platforms, including Instagram, LinkedIn, and USASpending.gov, and news outlets.  *Id.* The memo includes nine screenshots, all from Instagram.  *Id.* at 484–86.

The memo includes, among other details, that Kayhan's founders—Chief Executive Officer, Mr. Siamak Hesar, and Chief Technical Officer, Mr. Araz Feyzi—"are both originally from Iran and received their undergraduate degrees from a government-tied entity in Tehran [(Sharif University)] in 2004 and 2005."  AR at 483.  Further, the memo explains that Mr. Feyzi still has relatives living in Iran, and states that "[Mr.] Feyzi's family would be valuable assets should the Iranian government seek to recruit industry experts like [Mr.] Feyzi."  AR at 487. Additionally, because "Iran is known to utilize extraterritorial intimidation strategies such as hostage diplomacy or coercive diplomacy. . . Iran could hold [Mr.] Feyzi's family members hostage or threaten harm through harassment, surveillance, and imprisonment, as leverage to influence him to share his expertise in satellite technologies or even details of US government-funded contracts."  *Id.*  Finally, the memo concludes:

> Although Feyzi has been an outspoken critic of Iran's Islamic Regime through attending protests and raising awareness through social media, the increased profile of both Kayhan and its founders through the company's growth in both private and public sector would eventually put them under the radar of the Iranian government as a potential opportunity to extract US talent and technologies.

*Id.*  Accordingly, based on the information available, the memo explains that Kayhan's proposal presents a "Very High Risk."  AR at 488.  This "Very High Risk" assessment came from several risk factors codified in the SBIR Extension Act, which apply when an SBIR applicant "has an owner or covered individual that has a foreign affiliation with a research institution located in . . . [a] foreign country of concern," 15 U.S.C. § 638(g)(15)(A)(iii) (2022), and this relationship "present[s] concerns about conflicts of interest," *id.* § 638(g)(15)(B)(iii) (2022), or was "not

15

appropriately disclosed," *id*. § 638(g)(15)(B)(iv) (2022); AR at 488 (citing 15 U.S.C. § 638(g)(15)(A)(iii), (B)(iii), (B)(iv) (2022)[4]).   The due diligence review memo listed three potential mitigation strategies, including asking Kayhan to fill out a self-attestation form avowing that its founders do not have current links to the country of Iran.   AR at 488.

On March 6, 2025, the Air Force RMRB completed its corrective action review and notified Kayhan that it was not selected for award.   AR at 569.   The Air Force RMRB created a memorandum for Kayhan, dated March 4, 2025, which explained that the Air Force "reviewed classified and unclassified information" and provided "an unclassified rationale [that] factored into the risk assessment."   AR at 570–71.   The RMRB memorandum justified its decision based on different facts than the AFWERX due diligence review memorandum. *See id.* at 571.   Specifically, the unclassified information relevant to the RMRB decision includes the fact that Mr. Feyzi "was previously employed at an entity owned and controlled by Pasargad Bank in Iran."   *Id.*   The memorandum explains that "Pasargad Bank is under U.S. sanctions by the Office of Foreign Assets Control for aiding in malign Iranian activities, and many of its shareholders are connected to the Islamic Revolutionary Guard Corps."   *Id.*   Further, Mr. Feyzi and Mr. Hesar each "attended college at Sharif University of Technology located in Tehran, Iran.   This University has Iranian Government ties and is subject to financial sanctions by the European Union (EU) and the United Kingdom (UK) due to the University's links to Iran's nuclear program."   *Id.*   The memorandum states that "Sharif University has a cooperative relationship with the IRGC," which "as part of a whole-of-government approach, cooperates with Sharif University of Technology in military and

---

[4] On April 13, 2026, the Small Business Innovation and Economic Security Act renumbered and slightly modified the factors that were previously listed at 15 U.S.C. § 638(g)(15).   Pub. L. No. 119-83, sec. 2(a), 140 Stat. 755, 755 (2026).

16

ballistic missile-related projects." *Id.* Kayhan did not disclose the connection to Pasargad Bank or the connections to Sharif University on its foreign disclosure form. *Id*.

The same March 4, 2025, memorandum further explains that the Air Force had assigned Kayhan a rating on the five DoD Due Diligence program risk factors. AR at 571. Kayhan received low risk ratings for Factor 1 (Foreign Talent Recruitment Program), Factor 3 (Foreign Patents, Intellectual Property, and Technology Transfers), and Factor 4 (Financial Obligations). *Id.* Kayhan received a "High Risk" rating for Factor 2 (Foreign Ownership/Control) and a "Very High Risk" rating for Factor 5 (Foreign Affiliations).[5] AR at 571. As described in the memorandum, although risk mitigation measures were considered with respect to Factors 2 and 5, ultimately, the RMRB concluded that the risks presented could not be adequately mitigated. AR at 572. Accordingly, Kayhan's proposal was not selected based "on national security grounds." *Id.* Finally, the Air Force clarified that a "denial of award does not constitute a suspension, debarment, [or] SBIR/STTR programmatic ineligibility." AR at 572.

## VI.    Unclassified Supplement

On May 21, 2025, the Air Force provided an unclassified supplement of the AR, to "expand on the information that was presented to the [RMRB]" using information that "is not inconsistent with the classified reports presented and considered during [the RMRB] review." AR at 583–84. The Air Force explains that this supplement is a "reconstruct[ion]" of the classified "counterintelligence assessment at the unclassified level—to the extent possible." AR at 578. The supplement explains that Sharif University "has relationships with the IRGC and the Iranian Ministry of Defense." *Id.* Additionally, the supplement states that "[a]ccording to the American

---

[5] Each rating was the second-highest possible rating for the applicable factor under the Common Risk Matrix. AR at 447–48. There is no "Very High Risk" rating available for Factor 2. AR at 447.

17

Enterprise Institute, Iran and the IRGC use and exploit students and businesspeople sent to the West to gain access to the latest in advanced technical fields." *Id.* Later, the "Iranian government often reaches out to [these individuals] to encourage return to Iran." *Id.* In 2024, Canada withheld research funding from those collaborating with Sharif University, deeming it a "university, research institute or laboratory" connected to "entities that could pose a risk to Canada's national security." *Id.* at 579. The European Union, the United Kingdom, and Japan have imposed sanctions on Sharif University "for various periods" since 2012, because of "concerns relating to the proliferation of missiles and nuclear weapons." *Id.*

With respect to Mr. Feyzi's previous employment at Pasargad Bank, the unclassified supplement states that the United States has imposed sanctions on Pasargad Bank "for aiding malign Iranian activities, and many of its shareholders are connected to the IRGC." AR at 579. The financial sector in Iran, which includes Pasargad Bank, "funds the Iranian government's malign activities." *Id.* Additionally, according to the unclassified supplement, "there is considerable evidence that the bank plays a major role in the IRGC's economic empire." *Id.*

The unclassified supplement also notes that to perform its services, Kayhan "would need to have access to satellite flight data, including access to all the necessary algorithms for collision avoidance," and that "Iran has a strong interest in developing both its military and civilian space technology." AR at 580.

## VII.    Procedural History in the Court of Federal Claims

Kayhan filed its Complaint on January 21, 2025. ECF No. 1. On January 30, 2025, this Court stayed Kayhan's protest until February 25, 2025, to permit the Air Force to complete its corrective action reevaluation (referenced above), which had already begun in response to Plaintiff's protest at the GAO. ECF No. 20 at 1. After the corrective action was completed and

18

the stay was lifted, Defendant filed the unclassified record and provided the classified contents of the record to this Court for *in camera* review on March 12, 2025.  ECF Nos. 23, 24.  On March 14, 2025, Kayhan filed its First Amended Complaint.  Am. Compl.  Subsequently, Plaintiff and Defendant (collectively, the Parties) briefed the issue of whether Kayhan's counsel could access the contents of the classified record that led to the Air Force's adverse risk assessment.  *See* ECF Nos. 26, 27, 29, 30.  On April 30, 2025, the Court held oral argument on the issue of Kayhan's access to the classified record.  *See* Minute Entry dated April 30, 2025.  During oral argument, the Parties agreed to proceed on the basis of the unclassified Administrative Record and an unclassified supplement to the Administrative Record that the Air Force prepared.  ECF No. 34 at 47:16–19, 48:6–9; ECF No. 31 (ordering Defendant to file an unclassified supplement).  The Parties agreed that if Defendant were to prevail on its Motion for Judgment on the Administrative Record based on the unclassified Administrative Record and the unclassified supplement, Plaintiff would not seek to access classified material to continue litigation: "MR. RANSOM: . . . if it is determined that the unclassified record sufficiently supports the determination, we would consider that to end this case."  ECF No. 34 at 47:3–7.  Accordingly, Defendant filed the unclassified supplement on May 30, 2025.  ECF No. 35.

On June 27, 2025, Plaintiff filed its Motion for Judgment on the Administrative Record.  Pl. MJAR.  On August 8, 2025, Defendant filed its Cross-Motion for Judgment on the Administrative Record and Response to Plaintiff's MJAR.  Def. MJAR.  On August 22, 2025, Plaintiff filed its Reply in support of its MJAR and Response to Defendant's MJAR.  ECF No. 55 (Pl. Reply).  On September 2, 2025, Defendant filed its Reply in support of its MJAR.  ECF No. 58 (Def. Reply).  On December 11, 2025, the Court held oral argument on the cross-MJARs. *See* Minute Entry dated December 23, 2025; ECF 69 (MJAR OA Tr.).

19

One other issue remains.  In its Cross-MJAR, Defendant states:  "In its MJAR, Kayhan cites allegations in the amended complaint as well as declarations attached to the [A]mended [C]omplaint and a declaration attached to its MJAR."  Def. MJAR at 26 (citing Pl. MJAR at 19–21, 24).  Defendant contends that allegations in the Amended Complaint and its attached declarations, as well as in declarations attached to Plaintiff's MJAR, "contain extra-record evidence that impermissibly address the merits of this protest and [are] an unauthorized attempt to supplement the administrative record."  *Id*. at 26–27 (citing RCFC App. C).  Plaintiff's attachments include several declarations from Mr. Hesar, Mr. Feyzi, and other Kayhan executives.  Defendant contends that "[t]he declarations attached to the [A]mended [C]omplaint and the MJAR were not before the agency when it was conducting its due diligence review or when it reached its non-selection decision.  They are accordingly outside the administrative record and should not be considered."  Def. MJAR at 27.  On August 22, 2025, in response to Defendant's argument regarding the issue of the declarations, Plaintiff filed a Motion to Supplement the Administrative Record, arguing that these declarations are necessary to allow effective judicial review.  Pl. Mot. to Suppl.

On September 4, 2025, Defendant filed its Response to Plaintiff's Motion to Supplement the Administrative Record.  ECF No. 59 (Def. Resp. to Mot. to Suppl.).  Defendant requests that the Court deny Plaintiff's Motion to Supplement the Administrative Record, or, failing that, "to exclude from the administrative record, or otherwise disregard, irrelevant information, legal arguments, and hearsay included in those declarations."  *Id.* at 9.

20

## APPLICABLE LEGAL STANDARDS

### I.    Bid Protests

The Tucker Act, 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act of 1996, affords this Court with jurisdiction over bid protests.  The Court analyzes the procurement under the Administrative Procedure Act's (APA) standards to determine whether the Agency "acted without rational basis or contrary to law when evaluating the bids and awarding the contract."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); 28 U.S.C. § 1491(b)(4); *see Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1374 (Fed. Cir. 2024). The Court reviews the procurement under the standards set forth in the APA.  28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021).  The APA requires a reviewing court to determine whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974).  Thus, to prevail in a post-award bid protest, a plaintiff must demonstrate that "(1) 'the procurement official's decision lacked a rational basis' or (2) 'the procurement procedure involved a violation of regulation or procedure.'" *DynCorp Int'l v. United States,* 10 F.4th 1300, 1308 (Fed. Cir. 2021) (quoting *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020)).

When a bidder alleges that the procurement official's decision lacked a rational basis, the Court reviews "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1351 (Fed. Cir. 2004)).  As

21

the United States Court of Appeals for the Federal Circuit has explained, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa*, 238 F.3d at 1333); *see also Impresa*, 238 F.3d at 1333 (noting a similarly high burden for claims of a violation of regulation or procedure, which must involve "a clear . . . violation of applicable statutes or regulations" (quoting *Kentron*, 480 F.2d at 1169.)).  Consistent with this heavy burden, agency decisions are "entitled to a presumption of regularity." *Impresa*, 238 F.3d at 1338 (citing *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626–27 (1986)).  The Court's "role in reviewing procurement decisions . . . is not to evaluate the offerors' proposals anew or to substitute [its] judgment for that of the agency." *Harmonia Holdings Grp., LLC v. United States*, 999 F.3d 1397, 1408 (Fed. Cir. 2021); *see also Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.") (cleaned up).  Rather, courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp.*, 419 U.S. at 286.  Indeed, "[a]lthough the inquiry under the APA 'is to be searching and careful, . . . [t]he court is not empowered to substitute its judgment for that of the agency.'" *Insight Pub. Sector, Inc. v. United States*, 161 Fed. Cl. 760, 786 (2022) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416–20 (1971)).  When a disappointed bidder alleges a violation of a regulation or procedure, the Court reviews whether there was "a clear and prejudicial violation of applicable statutes or regulations." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting *Kentron Hawaii, Ltd v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

22

In the Court of Federal Claims, bid protests are adjudicated under Rule 52.1(c), which provides an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum*, 404 F.3d at 1356 (referencing Rule 56.1, which was replaced by Rule 52.1(c)); *see* Rule 52.1(c) of the Rules of the United States Court of Federal Claims. Unlike at summary judgment, genuine disputes of material fact do not preclude a court from granting a motion for judgment on the administrative record. *Bannum*, 404 F.3d at 1357. This Court is also empowered to provide any relief, including declaratory or injunctive relief, that it deems proper. 28 U.S.C. § 1491(b)(2); *Oak Grove*, 116 F.4th at 1375. "[T]he Court of Federal Claims has broad equitable powers to fashion an appropriate remedy" in bid protest cases. *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011). To that end, this Court may remand the procurement decision back to an agency for further factual findings or reconsideration according to the Court's directions. *See* Rule 52.2; 28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the [Court of Federal Claims] shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."); *see GovCIO, LLC v. United States*, 177 Fed. Cl. 579, 596 (2025).

## II.    <u>National Security Determinations</u>

In addition to the substantial discretion afforded to the Agency's decision in standard bid protests, this Court must afford additional deference where matters of national security are implicated. *See Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Indeed, the Supreme Court has directed that, in matters of national security or defense, courts should show great deference to the judgment of military authorities. *Id.* (noting the "great deference" that courts owe "to the professional judgment of military authorities concerning the relative importance of a particular military interest." (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986))). The Supreme Court further noted that "when it comes to collecting evidence and drawing inferences

23

on questions of national security, the lack of competence on the part of the courts is marked." *Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (citation omitted). Indeed, in this Court, "[w]hen matters of greater agency discretion are involved, it is more difficult for a protestor to prove that a procurement decision was arbitrary and capricious. Moreover, where acquisitions concerning national defense and security are involved, the Court must afford even wider deference to the agency." *CHE Consulting, Inc. v. United States*, 78 Fed. Cl. 380, 387 (2007), *aff'd*, 552 F.3d 1351 (Fed. Cir. 2008) (citation omitted); *see also* 28 U.S.C. § 1491(b)(3) ("In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security.").

### III.    De Facto Debarment

"A de facto debarment occurs when there is 'a systematic effort by the procuring agency to reject all of the bidder's contract bids.'" *Avkare, Inc. v. United States*, 125 Fed. Cl. 11, 29 (2016), *aff'd*, 673 F. App'x 1011 (Fed. Cir. 2017) (quoting *TLT Const. Corp. v. United States*, 50 Fed. Cl. 212, 215–16 (2001)). To establish a de facto debarment, a plaintiff must show that "the agency has either stated or engaged in conduct demonstrating that it will not award the contractor future contracts." *Id.* Regarding the conduct that would demonstrate a de facto debarment, courts have established a high standard: "[t]o succeed, [plaintiff] must demonstrate a 'systematic effort by the procuring agency to reject all of the bidder's contract bids.'" *TLT Const. Corp. v. United States*, 50 Fed. Cl. 212, 215 (2001) (quoting *Stapp Towing, Inc. v. United States*, 34 Fed. Cl. 300, 312 (1995)). This is a "heavy burden of proof" for a Plaintiff. *Frazier v. United States*, 79 Fed. Cl. 148, 169 n. 10 (2007), *aff'd*, 301 F. App'x 974 (Fed. Cir. 2008).

IV.    **Motion to Supplement the Administrative Record**

"The purpose of limiting judicial review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'" *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1331 (Fed. Cir. 2018) (quoting *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2018)).  Judicial review of agency action focuses on "the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA." *Axiom*, 564 F.3d at 1381.  For this reason, "supplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review." *AgustaWestland*, 880 F.3d at 1331 (quoting *Axiom*, 564 F.3d at 1378).  "A party seeking to supplement the administrative record bears the burden of showing why the current record is insufficient for effective judicial review." *LS3, Inc. v. United States*, 163 Fed Cl. 1, 7 (2022) (citing *Swift & Staley, Inc. v. United States*, 159 Fed. Cl. 494, 505 (2022)).

**DISCUSSION**

Plaintiff challenges the rationality of the Air Force's security risk assessment and that decision's compliance with statutes and regulations. Pl. MJAR at 18–19.  Plaintiff also argues that the Air Force's adverse determination has resulted in a de facto debarment. *Id.* at 34.  Finally, Plaintiff moves to supplement the record with several declarations from Kayhan executives. Pl. Mot. to Suppl. at 1.  Defendant counters that the Air Force acted rationally, did not violate statutes or regulations, and has not de facto debarred Plaintiff.  Def. MJAR at 9–10.  Additionally, Defendant opposes the Motion to Supplement the Administrative Record.  Def. Resp. to Mot. to Suppl. at 1.

*First*, the Court must evaluate the rationality of the Air Force's decision. If the Air Force made an irrational decision or failed to explain its reasoning, then the decision was arbitrary and capricious and must be overturned. As explained further below, however, it is clear here that the Administrative Record rationally supports the Air Force's decision to exclude Kayhan due to a security risk and that Plaintiff's arguments to the contrary amount to mere disagreements with the Air Force's reasoning. In addition, the Administrative Record supports the Air Force's determination that Plaintiff could not mitigate the security risk. Under this circumstance the law is clear that this Court cannot substitute its own judgment for the military's expertise in assessing security risks.

*Second*, the Court evaluates the Air Force's compliance with applicable statutes and regulations. Plaintiff challenges (1) the security assessment's compliance with the SBIR Extension Act; (2) the security assessment's compliance with the DoD Due Diligence Program and the associated risk framework; and (3) the Air Force's compliance with due process requirements in Air Force guidance implementing the Due Diligence Program. As described further below, the Court finds that the Air Force complied with all relevant statutes and regulations in making its determination.

*Third*, the Court evaluates Plaintiff's claim of de facto debarment. Plaintiff argues that the alleged de facto debarment has caused it to be effectively shut out of government contracting by the Air Force. The Court finds that Plaintiff has failed to prove its case on de facto debarment. The Air Force conducted an individualized security assessment in this procurement and applied that assessment to the procurement.

*Fourth*, the Court evaluates Plaintiff's Motion to Supplement the Administrative Record. Plaintiff seeks to supplement the Administrative Record with affidavits from Kayhan executives,

many of which rely upon inadmissible hearsay.  The Court will consider some of the affidavits to the extent that they are relevant to the allegation of de facto debarment and do not contain hearsay. However, the Court cannot supplement the Administrative Record to the extent the affidavits contain allegations that the Air Force decision was arbitrary and capricious or that the decision violated applicable statutes and regulations because the Court's review is limited to the record before the Air Force at the time of the decision.

I.   **Whether the Agency's Non-Selection Decision Was Arbitrary and Capricious**

The parties agree that whether a national security determination is arbitrary and capricious turns on whether the decision was reasonable.  *See Oak Grove*, 116 F.4th at 1374.  Plaintiff argues that the Air Force acted in an arbitrary and capricious manner because, based on the information in the record, its determination that Kayhan presented a security risk was unreasonable.  Pl. MJAR at 19.  Specifically, Plaintiff asserts that the "Court should set aside the Air Force's determination that Kayhan presents a security risk because the reasons underlying that finding . . . are facially unreasonable."  *Id.*  Defendant contends, to the contrary, that the Air Force's decision was reasonable based on its evaluation of the facts in the Administrative Record.  Def. MJAR at 29. After a thorough review of the record, it is evident that Plaintiff failed to demonstrate that the Air Force decision was arbitrary and capricious.  The Administrative Record supports the non-selection decision, and the Court does not accept Plaintiff's invitation to impose its own judgment on a national security determination that is within the military's expertise.  *See Harmonia Holdings Grp., LLC v. United States*, 999 F.3d 1397, 1408 (Fed. Cir. 2021) ("Our role in reviewing procurement decisions, however, is not to evaluate the offeror's proposals anew or to substitute our judgment for that of the agency."); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1371 (Fed. Cir. 2009); *Insight Pub. Sector*, 161 Fed. Cl. at 786.

Plaintiff argues that four facts cited in the Air Force assessment "all fail to pass the baseline test for reasonableness" to support the Air Force's conclusion that Plaintiff poses a security threat. Pl. MJAR at 24. *First*, Plaintiff argues that "under no test of reasonableness" could Mr. Feyzi's work for Pasargad Bank, which was later subject to sanctions, have created a security risk. *Id.* at 20. *Second*, Plaintiff argues that the founders' attendance and education at Sharif University, which was later sanctioned, "cannot reasonably have served as the basis for a heightened risk assessment of the company." *Id.* at 21. *Third*, Plaintiff argues that it was unreasonable for the Air Force assessment to criticize the founders for not disclosing their employment and education on a foreign disclosure form. *Id.* at 21–22. Plaintiff argues that the form "did not require such disclosure." *Id.* at 22 (emphasis omitted). *Fourth*, Plaintiff argues that the Air Force's statement, in an assessment besides the assessment challenged in this case, that Mr. Feyzi might be vulnerable to coercion through his family that remains in Iran, is unreasonable. *Id.* at 23. At oral argument, Plaintiff asserted that the Air Force failed to rationally justify the link between these facts and the security assessment: "[t]here's a lot of yadda, yadda, yadda in there." MJAR OA Tr. at 9:9–10 (citing *Seinfeld: The Yada Yada* (NBC television broadcast Apr. 24, 1997)).

Defendant argues that the Air Force's security assessment is rationally supported by the facts before the agency concerning the founders' attendance and work at Sharif University and Mr. Feyzi's work at Pasargad Bank. Def. MJAR at 34–35. In addition, Defendant argues that what Plaintiff characterizes as unreasonable conclusions "are mere disagreements with the Air Force's weighing of the facts and circumstances," which this Court does not review de novo. *Id.* at 35.

### A. Rational Basis for Air Force Assessment

The Administrative Record reflects that the Air Force had a reasonable basis to determine that Kayhan posed a security risk. The Court agrees with Defendant that the Air Force sufficiently explained its decision, especially considering the heightened deference that the Court owes the Air

28

Force on determinations related to national security. *See Winter*, 555 U.S. at 24. The Air Force provided the following basis to find Plaintiff a security risk: the founders attended Sharif University in Iran, and Mr. Feyzi worked at Pasargad Bank in Iran. AR at 571. In the unclassified supplement prepared for this protest, the Air Force reiterated that the decision was supported by these two facts, which establish that the Kayhan founders "have historical educational and employment ties to entities affiliated with the" IRGC. AR at 578. The Air Force considered that Iran "has a strong interest" in developing its own space technology, and the Air Force found that Kayhan "would need to have access to satellite flight data" to perform on the contract. AR at 580. The Air Force reasoned that giving Kayhan access to the information required for this particular contract presented "national security risks," as the "disclosure of some of the information would present unacceptable risk to national security." AR at 571. The Air Force also found that mitigation of the risks would not be possible for performance of this contract. AR at 572. The Air Force concluded that Kayhan thus "shall not be eligible for award and shall not be selected for award." *Id.* As described more fully below, the Air Force made a rational decision because it evaluated the facts before it and concluded—on the basis of its military expertise in national security, which receives deference in this Court—that a contract award posed an impermissible national security risk. *See Winter*, 555 U.S. at 24.

The Air Force had a reasonable basis in the record to establish the Kayhan founders' links to Iran. The Air Force considered Mr. Feyzi's visa application to come to the United States, in which he disclosed that he worked at Pasargad Bank. AR at 579. In the visa application, Mr. Feyzi included his work at Pasargad Bank and listed his job title as "Senior Expert." AR at 587. Similarly, the record contains evidence that each founder studied Industrial Engineering at Sharif University. AR at 484. The Air Force considered that the United States has sanctioned Pasargad

29

Bank "for aiding in malign Iranian activities" and that the bank is linked to the Islamic Revolutionary Guard Corps. AR at 575. The Air Force similarly considered that the European Union and United Kingdom have sanctioned Sharif University for its "links to Iran's nuclear program" and that Sharif University "has a cooperative relationship with the IRGC." *Id.* Thus, the record before the Air Force reasonably supported the facts upon which the Air Force made the security assessment. *See Dell Fed. Sys.*, 906 F.3d at 992.

### B. Plaintiff's Disagreements with the Air Force

Plaintiff argues that the security assessment "is facially and deeply flawed" because the Air Force could not reasonably draw its conclusions from the facts in the record. Pl. MJAR at 19. Defendant argues that Plaintiff attempts to recharacterize disagreements with the Air Force's judgment—which this Court cannot review—as challenges to the Air Force's rational basis. *See* Def. MJAR at 35 ("Kayhan's arguments are mere disagreements with the Air Force's weighing of the facts and circumstances."). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Weeks Marine*, 575 F.3d at 1371 (quoting *Honeywell*, 870 F.2d at 648).

Plaintiff fails to demonstrate that the Air Force's evaluation was irrational because it was based upon the Kayhan founders' links in Iran in the mid-2000s. *See* Pl. MJAR at 19–21. Plaintiff argues that "under no test of reasonableness" could the Air Force have determined that Mr. Feyzi's work with Pasargad Bank created a security risk because he worked at the bank for a limited period of time 13 years before the United States sanctioned the bank.[6] *Id.* at 20. Similarly, Plaintiff

---

[6] Plaintiff also cites evidence not before the Air Force about the content of Mr. Feyzi's work with Pasargad Bank. *See* Pl. MJAR at 20. However, the Court cannot consider such extra-record evidence as the Court's role is to evaluate whether the Air Force made a reasonable decision based on the record before it. *See infra* Discussion IV.B.

argues that the founders' education at Sharif University "cannot reasonably have served as the basis for a heightened risk assessment of the company" because they left by 2006 and sanctions were not imposed until 2012. *Id.* at 20–21. Plaintiff fails to cite any precedent in support of its assertion that it is unreasonable for the military to make a national security-related determination based on a person's ties to a sanctioned foreign entity because the ties are more than a decade old or the foreign entity was not sanctioned at the time the ties were created. *See id.* at 20–21.

Defendant argues that "Kayhan's argument is asking this Court to substitute the Court's, or Kayhan's, judgment for the Air Force's judgment," and the Court agrees. Def. MJAR at 36. It is not unreasonable to conclude that ties from a person's college days and early employment history may continue for many years, and it is not unreasonable to conclude that a sanctioned entity may have engaged in concerning activity for several years before sanctions were applied. Indeed, the unclassified supplement provided by the Air Force indicates that Sharif University has a "cooperative relationship" with the IRGC, that Sharif University "feeds Iranian students (and future entrepreneurs) to the United States," and that when "Sharif students go abroad to become educated professional Iranians in Western countries, the Iranian government often reaches out to them to encourage return to Iran." AR at 578. This evidence in the record indicates that older links to Iran might have been especially relevant for the Air Force to examine in this case because, according to the evidence before the Air Force, it is precisely students who previously attended Sharif University who might pose the security risk. In addition, the record before the Air Force does not state that the risks began only after the imposition of sanctions on Sharif University; it was reasonable and within the Air Force's judgment to consider that the risk arose before the imposition of sanctions. *See id.*

Plaintiff asks the Court to re-weigh the information that the Air Force already considered,

even though this Court is not the proper judge of who poses a security risk to the United States. *See Hawaii*, 585 U.S. at 704 ("[W]hen it comes to collecting evidence and drawing inferences on questions of national security, the lack of competence on the part of the courts is marked." (internal quotation marks and citation omitted)).   The Air Force evaluated the evidence in the record, including the years in which the Kayhan founders established their ties to Sharif University and Pasargad Bank, and reasonably determined that those ties supported a security risk determination. AR at 578–79.

Plaintiff also attacks evidence that the Air Force included in the record but did not rely upon in making its decision.  Pl. MJAR at 21–24.  Plaintiff argues that it is arbitrary and capricious that the Air Force "repeatedly criticizes Kayhan" for not disclosing foreign ties that, Plaintiff claims, the founders did not have to disclose.  *Id.* at 21.  Similarly, Plaintiff argues that it was arbitrary and capricious for the Air Force to reference Mr. Feyzi's family in Iran and his activism against the Iranian regime as a reason why Plaintiff would be vulnerable to Iranian coercion.  *Id.* at 23–24.  However, a protester cannot establish prejudice based on information in the record if the agency did not rely on such information to reach a decision.  *See Garrett Elecs., Inc. v. United States*, 163 Fed. Cl. 632, 675 (2023) (finding no prejudice when correction of alleged procedural violation "would not have affected the contracting officer's . . . determination"); *Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518, 527 (2007) (rejecting protest of technical evaluation when protester lost award due to non-technical factors); *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 228 (Fed. Cir. 2019) (quoting *Munoz v. Strahm Farms, Inc.*, 69 F.3d 501, 504 (Fed. Cir. 1995) ("The correction of an error must yield a different result in order for that error to have been harmful and thus prejudice a substantial right of a party.")); *Grumman Data Sys. Corp. v. United States*, 15 F.3d 1044, 1048 (Fed. Cir. 1994) (citation omitted) ("[S]mall errors

32

made by the procuring agency are not sufficient grounds for rejecting an entire procurement."); *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) ("A protester must show not simply a significant error in the procurement process, but also that the error was prejudicial, if it is to prevail in a bid protest."). In this case, Plaintiff must demonstrate not only that the Air Force erred in considering Mr. Feyzi's family ties to Iran, activism against the regime, and non-disclosure, but that "but for the alleged error, there was a '*substantial chance* that [it] would receive an award.'" *Id.* (quoting *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574–75 (Fed. Cir. 1983) (emphasis in original)); *see REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024); *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021).

Here, neither the lack of disclosure nor Mr. Feyzi's family status in Iran were factors that the Air Force identified as significant in the determination challenged in this case. *See* AR at 570–72 (Recommendation of Ineligibility), 577–82 (Unclassified Supplement); OA Tr. at 21:16–18 ("The risk determination was based entirely on the cofounders' university attendance and Mr. Feyzi's work at the bank."). Although the Air Force mentioned the lack of disclosure in its memorandum justifying the risk assessment, the same document determined that the award should be denied based on a provision in the SBIR Extension Act that allows a denial based on the security risks, rather than the non-disclosure of security risks. AR at 572 (citing 15 U.S.C. § 638(vv)(2)(A)). A separate provision in the SBIR Extension Act provides for denials based solely on a failure to disclose foreign ties. *See* 15 U.S.C. § 638(g)(15)(B)(iv). Neither the memorandum justifying the risk assessment nor the unclassified supplement reference the possibility of coercion related to Mr. Feyzi's family in Iran and his activism against the Iranian regime. *See* AR at 570–72, 577–82. References to factors not relied upon by the Air Force as contributing to its decision cannot sustain the basis for Plaintiff's protest. In sum, Plaintiff cannot

33

demonstrate either that the Air Force erred or that but for the alleged error, there was a substantial chance that it would receive an award.  *See* AR at 570–72; *REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024); *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021).

## II.   <u>Whether the Agency's Non-Selection Decision Was Consistent with Applicable Authorities</u>

Kayhan also argues that the Air Force's non-selection decision violated authorities that govern the security assessment in this procurement: (i) the SBIR Extension Act, the (ii) DoD Due Diligence Program, and (iii) the Air Force Guidance AFI 61-102. *See* Pl. MJAR at 24–34.  Plaintiff contends that the Air Force violated these authorities because its security assessment relied upon the Kayhan founders' educational and employment ties to Iran.  *Id.* at 25.  In addition, Plaintiff asserts that "this is not an area in which agencies are entitled to 'broad discretion.'"  *Id.* at 24. Defendant argues that these authorities permit the Air Force to consider the Kayhan founders' links to Iran.  Def. MJAR at 40.  Defendant also argues that the authorities grant the Air Force "deference . . . for national security concerns."  *Id.*  As noted, a plaintiff challenging an agency's adherence to a procurement statute or regulation "must show 'a clear and prejudicial violation of applicable statutes or regulations.'"  *Impresa*, 238 F.3d at 1333 (quoting *Kentron,* 480 F.2d at 1169).  Kayhan fails to do so here.

### A.  The SBIR Extension Act

First, the Parties dispute whether the Air Force violated the SBIR Extension Act.  The SBIR Extension Act states that agencies "shall establish and implement a due diligence program to assess security risks presented by small business concerns seeking a federally funded award."  15 U.S.C. § 638(vv)(1).  These due diligence programs mandated by the SBIR Extension Act must use  "a risk-based approach as appropriate" to assess "the cybersecurity practices, patent analysis,

34

employee analysis, and foreign ownership of a small business concern seeking an award, including the financial ties and obligations . . . of the small business concern and employees of the small business concern to a foreign country, foreign person, or foreign entity." 15 U.S.C. § 638(vv)(2)(A). The Department of Defense and the Air Force created their due diligence programs to comply with and implement the SBIR Extension Act. AR at 438, 504.

Plaintiff contends that "nothing in the statute's plain language suggests that the diligence programs to be established were intended to be limitless, backwards-looking dragnets—the type in which the Air Force engaged here—to disqualify U.S. small businesses and their U.S. citizen owners from the SBIR program based on long-extinguished connections to a foreign undergraduate program or entry level position at a foreign company." Pl. MJAR at 27. Further, Plaintiff argues, the SBIR Extension Act cannot "be read to conclude that such [a review] could be justified under the authority of 15 U.S.C. § 638(vv)." *Id*.

Defendant asserts in contrast that the statute's language "demonstrates Congress's intent to provide agencies with discretion when assessing national security risks under their due diligence programs." Def. MJAR at 40–41 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394–95 (2024)); *see also* 15 U.S.C. § 638(vv)(2)(A) ("Each [due diligence program] shall . . . assess, using a risk-based approach *as appropriate* . . . ." (emphasis added)). Further, Defendant argues, the Act does not "temporally limit the information that an agency can assess." Def. MJAR at 40. Defendant concludes that "it was within the Air Force's discretion to analyze information that it determined, within its expertise on national security concerns, was relevant to the four categories of analysis delineated in the statute." *Id.* at 41 (citing *Kaplan v. Conyers*, 733 F.3d 1148, 1164 (Fed. Cir. 2013) ("Defining the impact an individual may have on national security is the type of predictive judgment that must be made by those with necessary expertise.")).

The Court finds that the Air Force's action was consistent with the SBIR Extension Act. First, the Court agrees with Defendant's reading of the SBIR Extension Act: the SBIR Extension Act plainly affords agencies discretion to evaluate and address security risks. *See* 15 U.S.C. § 638(vv). Congress "delegates discretionary authority to an agency" through the use of "a term or phrase that 'leaves agencies with flexibility.'" *Loper Bright*, 603 U.S. at 395 (quoting *Michigan v. EPA*, 576 U.S. 743, 752 (2015)). Words that signal agency discretion in how to apply a statute include "'appropriate' or "reasonable.'" *Id.* Here, the SBIR Extension Act states that agencies should assess security concerns "using a risk-based approach *as appropriate*." 15 U.S.C. § 638(vv)(2)(A) (emphasis added). This use of "as appropriate" indicates that Congress granted the Air Force and other agencies the discretion over how to assess security risks. *See Loper Bright*, 603 U.S. at 395.

Plaintiff fails to establish that the SBIR Extension Act limits agencies from exercising their discretion to assess whether decades-old connections might present security risks. *See* Pl. MJAR at 27. Plaintiff argues that, overall, the Act is not meant to facilitate the creation of "limitless, backwards-looking dragnets." *Id.* However, Plaintiff merely disagrees with how the Air Force employed the discretion it receives from the SBIR Extension Act, as Plaintiff cannot identify a temporal limit in the statute. *See id.* "[O]nly the words on the page constitute the law," and Plaintiff does not identify any words in the SBIR Extension Act that create the temporal limit or restrict what evidence agencies may consider. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 655 (2020). The SBIR Extension Act lists several types of information that SBIR applicants must disclose and agencies must consider, but there is no textual indication that agencies can *only* consider such information. *See* 15 U.S.C. § 638(g)(13), 638(vv)(2). The type of evidence that might prove relevant to a security risk determination is within the Air Force's expertise and the

36

scope of discretion created by the SBIR Extension Act. *Cf. Kaplan*, 733 F.3d at 1164 ("Defining the impact an individual may have on national security is the type of predictive judgment that must be made by those with necessary expertise."). As such, the Air Force did not violate the SBIR Extension Act when it considered whether 20-year-old relationships could pose a security risk.

### B. The DoD Due Diligence Program

Next, the Parties dispute whether the Air Force's non-selection decision is consistent with the DoD Due Diligence Program.

### 1. The DoD Due Diligence Program

The DoD's Due Diligence Program was established and implemented via the Hicks Memo, which establishes "common minimum standards" to be "applied consistently across all DoD Components that make SBIR . . . awards." AR at 438. A "Common Risk Matrix" was attached to the Hicks Memo, which mandates certain minimum standards within the DoD Due Diligence program. *Id*. The DoD Due Diligence program implements the Common Risk Matrix. *Id*. The Parties dispute the conclusion reached by the Air Force after applying the Common Risk Matrix. Plaintiff reads the Common Risk Matrix in the DoD Due Diligence Program as a mandatory and controlling regulation that agencies must follow. *See* Pl. MJAR at 28. Defendant takes a broader view. *See* Def. MJAR at 45. It agrees that the Program is a mandatory and controlling framework but argues that the Common Risk Matrix merely sets the common minimum standards (the floor, not the ceiling), to ensure that certain minimum requirements are met by every DoD Component. *See id*. Plaintiff argues that Defendant violated the Common Risk Matrix by conducting additional review beyond what the standards require. *See* Pl. MJAR at 28–30. Defendant argues that the Air Force's analysis and conclusion were not inconsistent with the DoD Due Diligence program—as long as those minimum standards are met, nothing prevents an agency from conducting further review. *See* Def. MJAR at 46. As explained below, Defendant has the better reading.

With respect to Plaintiff's textual arguments regarding the Common Risk Matrix, Defendant notes that "[c]ontrary to Kayhan's arguments, the DoD Due Diligence Program does not prohibit components from evaluating Mr. Hesar's and Mr. Feyzi's connections to Sharif University as well as Mr. Feyzi's employment at [a Pasargad Bank subsidiary]." Def. MJAR at 44. Specifically, Defendant disputes Plaintiff's characterization of the DoD Due Diligence program and Plaintiff's construal and application of the language in the Common Risk Matrix. Def. MJAR at 40. Defendant argues that "insisting that this policy precludes the Air Force from even considering Mr. Hesar's and Mr. Feyzi's connections to Sharif University and Pasargad Bank is illogical given the deference to agencies for national security concerns and the ability to use other guidance (Air Force or DoD) for a holistic approach." Def. MJAR at 40. Defendant explains that the Common Risk Matrix that Plaintiff takes issue with is "the floor, not the ceiling, of a component's due diligence review." *Id.* at 45 ("This is because the DoD Due Diligence program is designed to work in conjunction with component due diligence programs.").

The Court agrees with Defendant and adopts its reasoning. First, the text of the DoD Due Diligence Program and the Common Risk Matrix clearly support Defendant's contention that this program establishes "the floor, not the ceiling" of a DoD Component's due diligence review. *See* Def. MJAR at 45. First, the Hicks Memo clearly states that "common minimum standards — published through this policy for the Defense SBIR and STTR Due Diligence Program — are applied consistently across all DoD Components that make SBIR or STTR awards." AR at 438. To that end, the Hicks Memo states that "DoD Components will follow the policies contained [in the Common Risk Matrix and Hicks Memo] . . . as they implement their DoD Component SBIR and STTR Due Diligence Programs." *Id*. Accordingly, common minimum standards were to be met by all DoD Components as they established their own, Component-specific, review programs.

The Hicks Memo anticipates, and directs, the creation of additional review programs. *See id.* When detailing requirements for each DoD Component's review process, like assessing security risks, the Hicks Memo includes the following language: "[a]t a minimum, each DoD Component's due diligence review to assess security risks policy will require" followed by a list of minimum requirements for the risk assessments. *Id.* at 442. Accordingly, the text of the Hicks Memo supports Defendant's argument—that this memorandum and the attached Common Risk matrix established "the floor, not the ceiling" of DoD Component review. There is nothing in the Hicks Memo or the Common Risk Matrix which suggests that, if a DoD Component had additional concerns beyond those detailed in the Hicks Memo and Common Risk Matrix, it would be forbidden from acting on those concerns because of the common *minimum* standards outlined in the Hicks Memo. Indeed, as the stated purpose of the DoD Due Diligence Review Process is to "ensure[] that SBIR and STTR awards made by the DoD Components will recognize and account for security risks posed by SBCs and helps to prevent awards that pose an unacceptable security risk to the Department that cannot be reasonably mitigated," it would make little sense, if, in applying that very same program, a DoD Component would be required to allow award to an SBC that the DoD Component had decided presented an unacceptable national security risk that could not be mitigated. *See* AR at 441. Accordingly, the Court accepts Defendant's reading of the DoD Due Diligence Program as outlined in the Hicks Memo, which emphasizes a holistic approach throughout multiple levels of Agency review, meeting common minimum standards throughout all those levels.

### 2. The Air Force's Assessment of Factor 2 and Factor 5

Plaintiff cites the definitions for Factor 2, Foreign Ownership/Control and Factor 5, Foreign Affiliations, of the Common Risk Matrix. Pl. MJAR at 29–30 (citing AR at 447–49).

39

Plaintiff also cites the attached definitions to the Hicks Memo, defining "affiliation," "association," and "security risks." *Id.* at 30 (citing AR at 450, 453). Plaintiff claims that these "definitions, coupled with the definitions of the risk ratings, confirm the Air Force's dispositive errors in designating Kayhan's proposal a security risk based upon former employment and student status." *Id.* at 31. First, Plaintiff argues that under the Common Risk Matrix, student status cannot constitute an "affiliation" or "association." *Id.* Yet, in Plaintiff's view, the Air Force's "High Risk" rating for Kayhan under Factor 2 was "directly and solely due to the fact that Kayhan's founders were formerly students at Sharif University." *Id.* (citing AR at 571). Plaintiff argues this discrepancy evinces a mistake by Air Force and that had the Air Force followed the definitions provided in the Common Risk Matrix accurately, their assessment for Factor 2 would have been "Low Risk." *Id.*

Second, Plaintiff contests the Air Force's assessment of "Very High Risk" under Factor 5. Plaintiff states that the Air Force's rating on Factor 5 was due to Mr. Feyzi's prior employment history with Pasargad Bank. Pl. MJAR at 31. However, Plaintiff argues that the language defining a "Very High Risk" indicates that rating is only intended to be applied to individuals with *current* connections or foreign affiliations. Specifically, Plaintiff focuses on the tense of the verbs in the definition, that the SBIR applicant "*has* affiliation" with an entity. *Id.* (emphasis added). Plaintiff argues that "the recency of such an affiliation matters under the terms of the Diligence Program," and that it is a present connection which entails "Very High Risk." *Id.* (citing AR at 447) (emphasis omitted). To Plaintiff, this "present connection requirement" is "confirmed by the definition of 'Low Risk': '[n]o indicator(s) that an owner or covered individual has an active affiliation.'" *Id.* (emphasis omitted). Accordingly, Plaintiff argues that Kayhan's rating of "Very High Risk" "directly contravenes the definitions in the Common Risk Matrix and must be set aside." *Id.* at

40

32.

Plaintiff elaborated at oral argument, alleging that the Air Force's "risk determination was based entirely on the cofounders' university attendance and Mr. Feyzi's work at the bank." MJAR OA Tr. 21:16–18. In Plaintiff's view, making the determination upon this basis was "directly inconsistent" with DoD's risk assessment guidance. *Id.* at 25:24–25. Plaintiff relies on 15 U.S.C. § 638(vv)(2)(A), which, under Plaintiff's reading of the statute, "specifically carves out university attendance as an undergraduate or graduate student as a basis for a risk assessment." *Id.* at 25:17–19. Furthermore, Plaintiff argues, "DoD risk guidance direct[s] that risks result from ongoing affiliations," and there is no "ongoing" affiliation under the terms of the Risk Matrix. *Id.* at 25:16–17; *see also id.* at 55:12–16 ("[N]o, there is nothing [ongoing] in the record. There is only the fact that they attended the university in 2005. You do not have to draw a line to say that is not a connection because the matrix does it for you.").

While Defendant acknowledges that the DoD Due Diligence Program "defines an '[a]ffiliation' and an '[a]ssociation' as '[a]cademic (not including undergraduate or graduate students), professional, or institutional appointments or positions' with 'a foreign government-connected entity,'" it accurately notes that Mr. Feyzi was not, in fact, merely an undergraduate student: according to the record before the Air Force, Mr. Feyzi held positions as a research assistant and teaching assistant for several years. Def. MJAR at 47 (quoting AR at 450 and citing AR at 587). Accordingly, under the definitions within the Memorandum, the Air Force's concern was warranted; such positions constitute an "indicator" of an affiliation with an institution in Iran, because it is an aspect of his activity "that may reveal or acknowledge undue foreign influence." *Id.* (quoting AR at 447–48, 453).

41

Regarding the temporal limitation which Kayhan identifies in Factor 2 and Factor 5 of the DoD Due Diligence Program, Defendant argues that the definitions of "affiliation" and "[a]ssociation" in the Memo do not include a temporal limitation. *Id.* at 48 (citing AR at 450). Although Defendant concurs that the matrix uses the term "active" affiliation in defining "Low Risk" in Factor 5, it argues that Plaintiff's attempt to hang its whole argument on the use of the term "active" and the present tense leads to more questions than answers. *Id.*  In particular, Defendant argues, while "Kayhan attempts to read in a temporal limitation due to the use of present-tense verbs, the DoD Due Diligence Program uses present tense in situations where context demonstrates that past conduct should be considered." *Id.* (citing AR at 448 and 449).  Further, Defendant asserts, "When applying Kayhan's reasoning [that there is a temporal limitation] there is a gap in Factor 2—how must a component evaluate indicators of 'past' connections?" *Id.*

The Court concurs with Defendant.  When considering the broader scheme of the review programs, and the fact that the Common Risk Matrix applies "minimum requirements" across DoD Components, the Court concludes that, as the Hicks Memo states, the Common Risk Matrix directs that "[a]t a minimum," a DOD Component's security review framework will review foreign affiliations but may carve out undergraduate or graduate attendance at a university.  AR at 442. Once more, these are "common minimum standards" which are "published through" the policy laid out in the Hicks Memo.  AR at 438.  Accordingly, it does not violate the Due Diligence Program for the Air Force to conclude under its specific review process, which implements and is consistent with the Common Risk Matrix, that Kayhan presented "high" risk for factor 2 due to its disclosed "history of ties" to Sharif University via both academic attendance and teaching and research positions.  AR at 571 (noting Messrs. Hesar and Feyzi's "history of ties to Iranian entities" of concern); AR at 587 (Mr. Feyzi's visa application detailing his employment at Sharif

42

University); AR at 579 (indicating that the Air Force reviewed Mr. Feyzi's visa application during the review process). Furthermore, even if Plaintiff was correct that the definitions in the Hicks Memo provide a mandatory carve out for graduate or undergraduate attendance, Plaintiff would be no better off, as Kayhan would still not be low risk for all factors in the Common Risk Matrix. *See* AR at 571–572 (evaluating Kayhan as "Very High Risk" for factor 5 based on Mr. Feyzi's previous employment at an entity controlled by Pasargad Bank.).

Nor is the Court convinced by Kayhan pressing the Court to contradict the structure of the Due Diligence Program and SBIR Extension Act based on the use of the present tense in the Hicks Memo. As Defendant points out, the present tense is not used consistently throughout the Hicks Memo to reference a temporal limitation on the review process. *See, e.g.,* AR at 448 (using present tense to reference events that happened before October 2019). The Court's reading is further reinforced by the language of the Hicks Memo, which defines "indicator[]" broadly as that which "may reveal or acknowledge undue foreign influence," and allows for the Air Force's determination based an "indicator[]" of an affiliation or association. *See* AR at 447-48, 453. Under this reading, the Air Force's determination—that a Kayhan founder's previous job with Pasargad Bank and the founders' various ties to Sharif University were indicators of affiliations leading to a "High" and "Very High" risk assessment—is consistent with the Due Diligence Program.

### 3. DoD Due Diligence Program Mitigation Requirement

The DoD Due Diligence Program states that "[e]ach DoD Component will establish a risk mitigation review board, as well as a list of potential mitigation strategies" to "identify strategies to mitigate risks to the maximum extent practicable." AR at 444. If a RMRB recommends that a security risk "cannot be adequately mitigated," then "the recommendation must be provided, in writing, to the source selection official responsible for the relevant SBIR or STTR award." *Id.* In

addition, the agency RMRB must create "an unclassified rationale for the recommendation of ineligibility." *Id.* The unclassified rationale "must be appropriate for release to the SBC and must provide enough context about the reason(s) for ineligibility for award such that the SBC can work to mitigate any identified security risks." *Id.*

Plaintiff argues that the Air Force's notice to Kayhan was insufficient, as it stated only that "[t]he Risk Mitigation Review Board chair also considered potential mitigation actions/measures to overcome the security risks presented to the board and determined the security risks could not be adequately mitigated." Pl. MJAR at 33 (quoting AR at 572). Plaintiff complains that this was insufficient context to allow Kayhan to attempt to mitigate risks, and that there was "no explanation at all for why the identified security risks could not be mitigated." *Id.* Plaintiff alleges that the Air Force's conclusion regarding risk mitigation is "facially unreasonable." *Id.* at 34. Finally, Kayhan argues that "[i]t is utterly implausible that there are no mitigation measures to be undertaken to satisfy the Air Force's concerns. The Air Force's refusal to identify those measures . . . violates the DoD's Due Diligence Guidance." Pl. Reply at 28.

Defendant, however, argues that "mitigation of national security risks, like national security risk determinations themselves, are inherently discretionary." Def. MJAR at 50 (citing AR at 513). Defendant insists that "[i]t is within the Air Force's expertise to assess whether mitigation was possible considering the relationship between the Iranian government, Sharif University, and Pasargad Bank, as well as the connections of Kayhan's employees to those entities." *Id.* In any event, Defendant states that the record demonstrates that "mitigation strategies were considered" and that the "board considered that Messrs. Hesar and Feyzi had stated in a declaration that they do not maintain relationships with Iran besides relatives remaining in the country." *Id.* (citing AR at 560).

44

Defendant argues that the Air Force's notification to Kayhan met the requirements of the Due Diligence Program because although "the memorandum does not detail potential mitigation considered, identifying the security risks relied upon is sufficient to notify Kayhan of the basis of Air Force's decision such that Kayhan can work to mitigate the security risks identified." *Id.* at 51. Defendant argues that Kayhan's argument "amounts to a disagreement with the Air Force regarding the national security risks posed and their ability to be mitigated, which is a matter within the Air Force's discretion and expertise." Def. Reply at 21.

The Court agrees with Defendant. First, the Air Force met the DoD Due Diligence Program mitigation requirement to provide its recommendation that the risk cannot be adequately mitigated "in writing, to the source selection official." *See* AR at 444 (DoD Due Diligence Program requirement for written recommendation that risk cannot be adequately mitigated). Indeed, the RMRB chair met the requirement when he wrote a memorandum to the Air Force Research Laboratory (the office within the Air Force responsible for this procurement) in which he recommended, in writing, that Plaintiff's application be denied because a security risk could not be adequately mitigated. AR at 573 ("I considered potential mitigation actions/measures to overcome the security risks presented and determined the security risks could not be adequately mitigated."). The DoD Due Diligence Program does not require any more justification than that, by its plain text—the RMRB provided its recommendation in writing, to the responsible official. *See* AR at 444. The DoD Due Diligence Program does not require the RMRB to suggest its own methods of mitigation or list the mitigation options that were considered and rejected. *See id.* As such, the Air Force met the first of two requirements related to mitigation.

The Air Force also met the second mitigation-related requirement, under which the RMRB must "create and provide an unclassified rationale for the recommendation of ineligibility." *Id*.

This unclassified rationale "must provide enough context about the reason(s) for ineligibility for award such that the [small business concern] can work to mitigate any identified security risks." *Id.* Plaintiff argues that the Air Force did not meet this requirement because the unclassified rationale contained "no explanation at all for why the identified security risks could not be mitigated." Pl. MJAR at 33.[7] However, according to the plain language of the DoD Due Diligence Program, the requirement was not for the Air Force to explain why the risk could not be mitigated, but to "provide enough context about the reason(s) for ineligibility." AR at 444. The DoD Due Diligence Program places the responsibility upon the SBIR applicant, not the agency, to develop a mitigation strategy for future procurements. *See id.* The Air Force met that standard because the Air Force provided Plaintiff with the exact reasons for ineligibility: the Kayhan co-founders' links to Iran. *See* AR at 571–72. With these exact reasons for ineligibility in hand, Plaintiff can "work to mitigate any identified security risks" that arises from its co-founders' links to Iran. *See* AR at 444.

### C. Air Force Guidance AFI 61-102

Plaintiff argues that the Air Force failed to follow its own guidance in its risk assessment. Pl. MJAR at 25. Specifically, Plaintiff argues that the Air Force's decision not to allow Plaintiff to submit evidence opposing the security risk assessment "plainly violates the Air Force's own

---

[7] Plaintiff also makes a stray comment that it is "facially unreasonable" for the Air Force to conclude that the Kayhan executives' links to Iran pose a risk that cannot be mitigated. Pl. MJAR at 34. To the extent that this is an argument that the finding of an unmitigable risk was arbitrary and capricious, Defendant prevails for the same reason that the Air Force's assessment of a security risk was not arbitrary and capricious: the Air Force made a reasonable decision within the deference that the military receives on national security matters. *See supra* Discussion I.A. The Air Force "considered potential mitigation actions/measures" and "determined the security risks could not be adequately mitigated." AR at 572. This Court does not have the power to displace such a reasoned decision where the record supports the determination. *See also Hawaii*, 585 U.S. at 704 ("[W]hen it comes to collecting evidence and drawing inferences on questions of national security, the lack of competence on the part of the courts is marked." (internal quotations omitted)).

Due Diligence Guidance." Pl. Reply at 26. This guidance in AFI 61-102 prescribes the "due process" that SBIR applicants receive if the due diligence review finds a security risk. AR at 514. "The awarding organization must provide notice to the [small business concern] of denial/non-selection at the conclusion of the RMRB proceedings, or may request supplemental information while the proposal or application is pending evaluation or negotiation." AR at 515. The Air Force must also inform the applicant of the reasons for the risk determination, including at least the "general factual areas of risk to the extent such disclosures would not harm national security" if "critical defense or national security information" is involved. AR at 514.

Plaintiff contends that the Air Force failed to identify security risks in its communications with Kayhan. Pl. Reply at 26. In particular, Plaintiff argues that the Air Force's first denial of Plaintiff's application failed to meet the notification requirement. *Id.* (citing AR at 273). Plaintiff, however, acknowledges that the Air Force later provided sufficient notice during corrective action. *See id.* ("[T]he March 2025 notice finally identified Messrs. Hesar's and Feyzi's university attendance and Mr. Feyzi's bank job from nearly 20 years earlier as animating the Air Force's concerns."). Here, the Court only need determine whether the Air Force followed its procedures during the corrective action—an alleged procedural error that the agency remedies during corrective action is not a ground for a bid protest. *See Coast Pro., Inc. v. United States*, 136 Fed. Cl. 467, 474 (2018) ("[The agency]'s corrective action eliminates Plaintiffs' concerns . . . and makes these claims moot."). Thus, the Air Force's alleged failure to meet procedure before the corrective action is irrelevant. *See id.* As is relevant to this case, the Air Force met the AFI 61-102 requirement to provide notice of "general factual areas of risk to the extent such disclosures would not harm national security" during the corrective action. *See* AR at 514. The Air Force explained the "unclassified rationale" that "factored into the risk assessment," which included Mr.

47

Feyzi's employment history and the Kayhan founders' education. AR at 571. This information was the basis for the Air Force's security risk determination, and the provision of this information to Kayhan satisfied the Air Force's own requirements. *See* AR at 514.

Plaintiff also argues that the Air Force violated AFI 61-102 because "at no point has the Air Force ever provided Kayhan the opportunity to address those concerns." Pl. Reply at 26. However, Plaintiff fails to identify any provision in the guidance that guarantees it a right to present evidence to rebut a finding of a security risk. *See id.* Plaintiff argues that it is entitled to an "opportunity to respond" under the Air Force guidance. *Id.* (quoting AR at 515). However, the provision that Plaintiff quotes does not state that an applicant is entitled to a response but rather provides for a procedure by which the security review can consider classified information or an "unclassified summary" of the information. AR at 515. The RMRB chair must determine that the unclassified summary "affords the applicant a substantially similar opportunity to respond" as a metric for how complete the summary is, but the guidance never provides or guarantees a right to respond. *Id.* The same section of the guidance provides that the agency "**may** request supplemental information" from the applicant to evaluate security risks. *Id.* (emphasis added). The use of "may" indicates that the Air Force retains discretion over whether to seek supplemental information, and Plaintiff cannot establish here that it has a right to provide that supplemental information. *See Andersen Consulting v. United States*, 959 F.2d 929, 932 (Fed. Cir. 1992) ("The use of the permissive 'may' instead of the mandatory 'shall,' authorizes the [Agency] to employ its discretion in determining how to handle errors in procurement."). As such, Plaintiff was not entitled to the opportunity to respond to the Air Force's risk assessment, and the Air Force did not violate the AFI 61-102.

48

### III.    Whether Kayhan Has Established a De Facto Debarment

Next, the Parties dispute whether Kayhan has been de facto debarred. Plaintiff marshals two pieces of evidence regarding de facto debarment. Kayhan argues that it has "systemically been denied SBIR contract awards by the Air Force (and Space Force)," despite its prior history of winning awards. Pl. MJAR at 35. Plaintiff draws a connection between its alleged de facto debarment and the Air Force's application of heightened due diligence standards: "since the September 2022 passage of the SBIR and STTR Extension Act, Kayhan has submitted nine SBIR proposals to the Air Force and Space Force, none of which have been funded for award." *Id.* at 34. Plaintiff also argues that the Air Force's finding in this procurement that Kayhan's security risk cannot be mitigated amounts to a declaration that the Air Force debarred Kayhan. *Id.* at 35–36. Plaintiff argues that "[c]oupled together, those facts suggest federal agencies have not awarded Kayhan SBIR contracts because they believe they *cannot* award Kayhan those contracts." *Id.* at 35 (emphasis in original). Plaintiff concludes that even absent an affirmative statement that the Air Force will not award Kayhan future contracts, there are "clear and unequivocal indicia that agencies will not award to Kayhan," and that this is sufficient to establish de facto debarment. Pl. MJAR at 36.

With respect to Plaintiff's de facto debarment claim, Defendant asserts that "[i]f the Court agrees that the Air Force's risk assessment was rational, then this claim necessarily fails because the Court cannot preclude the Air Force from relying on the risk assessment" in this procurement. Def. MJAR at 52. Defendant then raises two defenses against the de facto debarment claim. First, Defendant argues that "[i]f Kayhan believes that an agency should not rely on the risk assessment in a different procurement, then Kayhan's recourse is to file a challenge related to that procurement." *Id.* Second, Defendant contends that Plaintiff has failed to prove de facto

debarment.  *Id.*  According to Defendant, Plaintiff "points to no statement of a contracting office that the Government will not award any contract to Kayhan in the future."  *Id.* at 53.  In addition, Defendant asserts that Plaintiff has made "no effort to show that it is being precluded from all Government contracting."  *Id.*

Plaintiff has failed to demonstrate that de facto debarment occurred in the procurement at issue in this case.  The standard for de facto debarment requires that "the agency has either stated or engaged in conduct demonstrating that it will not award the contractor future contracts," and Plaintiff has demonstrated neither.  *Avkare*, 125 Fed. Cl. at 29 (citation omitted).  Plaintiff has not met the "heavy burden of proof" required to prove de facto debarment.  *Frazier*, 79 Fed. Cl. at 169 n. 10.

First, Plaintiff has not demonstrated that the Air Force "stated . . . that it will not award" Kayhan any future contracts.  *Avkare*, 125 Fed. Cl. at 29.  In its MJAR, Plaintiff did not cite any evidence that the Air Force had made such a statement.  *See* Pl. MJAR at 35.  In its Reply, Plaintiff cites two declarations in which Kayhan corporate officers allege that other individuals said that some other official in the Air Force said Kayhan should not receive contracts.[8]  *See* Pl. Reply at 31 n.12 (citing Bacon Decl. ¶ 3 (ECF No. 25-1), Second Suppl. Hesar Decl. ¶ 16 (ECF No. 41-1)). In the first of these declarations, a Kayhan officer claims that a former Air Force servicemember, who spoke to Kayhan after he left the Air Force, alleged that an unspecified Air Force Office of Special Investigations (OSI) employee had told the servicemember not to work with Kayhan. Bacon Decl. ¶ 3 (ECF No. 25-1).  In the second declaration, a Kayhan officer and owner claims

---

[8] As the Court grants in part Plaintiff's Motion to Supplement the Administrative Record, the Court permits and thus considers the declarations included in Plaintiff's Motion to Supplement the Administrative Record, insofar as they discuss de facto debarment and are not otherwise inadmissible.  *See infra* at Discussion IV.C.

50

that an Air Force contracting officer who was responsible for a procurement besides the procurement at issue in this case alleged that Air Force OSI "had reached out to her and instructed her not to sign the TACFI contract with Kayhan."  Second Suppl. Hesar Decl. ¶ 16 (ECF No. 41-1).

Plaintiff's evidence of an alleged agency statement that it will not award a contract to Kayhan falls far short of the evidence available in *Art-Metal-USA, Inc. v. Solomon*, which Plaintiff cites for the de facto debarment standard.  473 F. Supp. 1 (D.D.C. 1978); Pl. MJAR at 35.  There, agency officials stated outright in depositions that they would not consider working with the contractor due to an ongoing investigation outside the traditional debarment process.  *Art-Metal*, 473 F. Supp. at 5.  Here, in contrast, Plaintiff has offered only multiple levels of hearsay, without any declarations or affidavits written by the government officials alleged to have engaged in the de facto debarment.  *See* Pl. Reply at 31 n.12.  To the extent that the declarations could somehow constitute non-hearsay or fall under a hearsay exception, they still contain insufficient evidence to prove the facts asserted.  *See NCL Logistics Co. v. United States*, 109 Fed. Cl. 596, 613 (2013) ("Because the report is hearsay, has not been subject to cross-examination or rebuttal, and this Court has not accepted [declarant] as an expert, observed his demeanor, or evaluated his credibility, this untested report lacks probative value."); *Madison Servs., Inc. v. United States*, 94 Fed. Cl. 501, 511 (2010) ("The intrinsic unreliability of innuendo, inference and hearsay is enough here to sink plaintiff.").  In contrast, the record reflects that the security assessment and contract denial does not constitute a debarment.  AR at 572 ("A denial of award does not constitute a suspension, debarment, SBIR/STTR programmatic ineligibility, exclusion from all or any other Federal contracts or agreements nor prohibit future opportunities with the Department of the Air Force.").  Such a statement is entitled to the "presumption of regularity," accorded government

51

officials, which can only be overcome with clear and convincing evidence. *Impresa*, 238 F.3d at 1338. *See also Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002). Plaintiff has presented no evidence, much less clear and convincing evidence, to overcome this presumption. As such, Plaintiff has not met its burden to demonstrate that the Air Force "stated . . . that it will not award" Kayhan any future contracts with its hearsay declarations. *Avkare*, 125 Fed. Cl. at 29.

Second, Plaintiff has not proven that the Air Force "engaged in conduct demonstrating that it will not award" Kayhan any future contracts. *Id*. Kayhan argues that the Air Force has demonstrated the de facto debarment because Kayhan "has systematically been denied SBIR contract awards by the Air Force (and Space Force)" since the risk assessment in this procurement. Pl. MJAR at 35. Specifically, Kayhan alleges that after Congress tightened security requirements in the SBIR Extension Act, the Air Force has denied all nine of Kayhan's applications for SBIR contracts. Pl. MJAR at 34. However, this case does not concern nine procurements; rather, this case concerns only Plaintiff's denial in one particular procurement based on a security assessment. *See* Am. Compl. ¶ 1 ("This protest arises . . . under Solicitation No. AFX 23.8.").

The record demonstrates that the Air Force denied Kayhan's application for this procurement on the basis of a security assessment prepared for this particular procurement. *See* AR at 576 ("The assessment and recommendation of non-award is specific for proposal F2D-9750a (RE-REVIEW)."). This case is not like *MG Altus Apache Co. v. United States*, in which the Army de facto debarred a contractor because the Army relied upon an unreviewable vendor rating that was not prepared for the procurement at issue. 111 Fed. Cl. 425, 444 (2013). In that case, instead of an individualized assessment for each procurement, the Army's official policy was that the unreviewable vendor rating would prevent the contractor from winning any contracts. *Id*.

52

Here, in contrast, the Air Force prepared an assessment for this particular procurement, and the Air Force explicitly said that this assessment should not preclude Kayhan from winning other contracts. *See* AR at 576 ("A denial of award does not constitute a suspension, debarment, SBIR/STTR programmatic ineligibility, exclusion from all or any other Federal contracts or agreements nor prohibit future opportunities with the Department of the Air Force."). Plaintiff further contends that that the Air Force has relied upon the risk assessment prepared for the procurement at issue in this case to reject Plaintiff in other procurements. Pl. MJAR at 32. However, this case concerns only whether Plaintiff was improperly denied a contract in the specific procurement at issue, not unrelated procurements not before the Court. *See* Am. Compl. ¶ 1 ("This protest arises from the [Air Force's] January 12, 2024 reversal of its selection of Kayhan's proposal for a contract award under Solicitation No. AFX 23.8."). As such, Plaintiff has failed to prove that systematic action amounting to de facto debarment prevented Kayhan from winning a contract in the challenged procurement.

IV.     **Plaintiff's Motion to Supplement the Administrative Record**

Also at issue is whether the Court should consider allegations made by Kayhan in its Amended Complaint and in declarations attached to Kayhan's pleadings. Def. MJAR at 26.

A.  **Background**

Throughout its pleadings, Plaintiff has attached several declarations which include the testimony of various Kayhan executives. *See* Hesar Decl. (ECF No. 25-1); Suppl. Hesar Decl. (ECF No. 25-1[9]); Feyzi Decl. (ECF No. 25-1); Suppl. Feyzi Decl. (ECF No. 25-1); Bacon Decl. (ECF No. 25-1); Melcher Decl. (ECF No. 25-1); Second Suppl. Hesar Decl. (ECF No. 41-1); Third

---

[9] Plaintiff included six declarations in the same filing on the electronic docket, at ECF No. 25-1.

53

Suppl. Hesar Decl. (ECF No. 55-1).  These filings include multiple amendments to Mr. Hesar's and Mr. Feyzi's declarations.  See *id.*

The declarations include additional information such as descriptions of Kayhan's founding and efforts to avoid foreign affiliations, details of each of Messrs. Feyzi's and Hesar's education, and affirmations of their loyalty to the United States.[10]  *See id.*

The Parties dispute what, if any, of this evidence should be included in the record for the Court to consider.  Defendant first argues that Plaintiff, when submitting its declarations, did not properly move to complete or supplement the record but rather dropped a bag of rocks into the litigation.  Def. MJAR. at 27.  In its Response on August 22, 2025, Plaintiff stated:

> To the extent the Government believes any references to Kayhan's declarations are a procedural error because Kayhan did not move to supplement the record with them (even though the Government acknowledges the declarations are properly before the Court to support Kayhan's claim of irreparable harm), contemporaneous with this filing, Kayhan moves to supplement the Unclassified Administrative Record with the declarations it has submitted to the Court to date, as well as the declaration Kayhan appends to this submission.

Pl. Response at 31 n.12.  That same day, Plaintiff filed a separate Motion to Supplement the Unclassified Administrative Record.  ECF No. 56 (Pl. Mot. to Supplement).  On September 4, 2025, Defendant filed its Response to Plaintiff's Motion to Supplement the Unclassified Administrative Record.  ECF No. 59 (Def. Resp. to Mot. to Suppl.).  Plaintiff did not file a reply to Defendant's Response.

Defendant contends that "[t]he allegations in the amended complaint, its attached declarations, and the declaration attached to Kayhan's MJAR contain extra-record evidence that

---

[10] The declarations also include more personal details, such as Messrs. Feyzi's and Hesar's upbringing, family, perspective on the Iranian regime, children, and family struggles with illness. *See id.*  While the Court understands why Plaintiff seeks to include such declarations in the record, the referenced portions are neither necessary nor relevant to the Court's review of the Government's non-selection decision here.

impermissibly address the merits of this protest and is an unauthorized attempt to supplement the administrative record."  Def. MJAR at 26–27 (citing Pl. MJAR at 19–21, 24, RCFC Appendix C). Meanwhile, Plaintiff argues that these declarations are necessary to effect meaningful judicial review because they address:

> (1) Messrs. Hesar's and Feyzi's university attendance and former bank employment, and the fact that their ties to both institutions ended no later than 2006; (2) the facts demonstrating that Kayhan had been *de facto* debarred from Air Force and Space Force SBIR procurements; and (3) the irreparable harm Kayhan would suffer in the absence of an injunction.

Pl. Mot. to Supplement at 3.  Defendant replies that Plaintiff is attempting to use these declarations improperly to support the merits of its bid protest, including its arguments that the Air Force's non-selection decision was irrational, and that the non-selection decision is not supported by evidence, in addition to the three topics Plaintiff named.  Def. Resp. to Mot. to Suppl. at 2.

### B.  Whether Supplementing the Record is Necessary to Allow Effective Judicial Review of the Air Force's Non-Selection Decision and its Alleged Failure to Solicit a Response from Kayhan

Plaintiff's first argument for supplementing the unclassified administrative record is that the "declarations contain the information Kayhan's principals would have provided had the Air Force allowed Kayhan a response."  Pl. Mot. to Supplement at 4–5.  Plaintiff asserts that the Air Force erroneously deprived Kayhan of that opportunity because, according to the Air Force's own policies, the exclusion decision should have included "enough information for due process" so that it allows an "opportunity to respond."  *Id.* at 5; *see* AR at 515 ("Consistent with national security, the unclassified summary should contain enough information for due process . . . Upon determination that the substitution affords the applicant a substantially similar opportunity to respond, the RMRB Chairman will approve the unclassified basis").  As, Plaintiff claims, Kayhan's would-be response is allegedly "relevant to the risk assessment the Air Force failed to

consider" and "render[s] the risk assessment infirm," Plaintiff contends that the information is "necessary to afford the Court effective judicial review" of the Air Force's actions. Pl. Mot. to Supplement at 5.

In response, Defendant first challenges as waived Kayhan's use of the argument that the Air Force was required to allow Kayhan an opportunity to respond to the non-selection decision—Kayhan only raised this argument "in the first instance in [its] reply brief." Def. Resp. to Mot. to Suppl. at 4. Accordingly, Defendant argues, Plaintiff has waived this argument. *Id.* Second, Defendant challenges the merits of Plaintiff's argument, that the Air Force was required to allow Kayhan to submit a response during its due diligence review process. *Id.* Rather, Defendant argues, Air Force guidance dictates that the Air Force will provide Plaintiff with "notice" of the reasons it "concluded [Plaintiff's] proposal presented a national security risk." *Id.* at 5. Defendant further points out that the "opportunity to respond" language Kayhan quotes is from a section of guidance discussing the content of the notice rather than requiring a notice-and-response process before making a non-determination decision. *Id.* Finally, Defendant argues that the information in the declarations is not responsive to the issue Plaintiff wishes to bring before the Court, which is whether the Air Force was required to provide Plaintiff with an opportunity to respond. *Id.* Rather, as Plaintiff itself states, the declarations include information that Plaintiff *would have* provided to Air Force had it had the opportunity to respond. *See* Pl. Mot. to Supplement at 4–5.

The Court agrees with Defendant. Kayhan has failed to meet its burden of establishing that its declarations are necessary for effective judicial review with respect to the Air Force's non-selection decision and supposed failure to solicit a response from Kayhan during the due diligence review process. The Court is not convinced that a declaration containing the content of a response "Kayhan's principals *would have* provided" to the Air Force is at all relevant to the issue of

56

whether the Air Force's failure to allow such a response contradicted its own guidance.  Pl. Mot. to Supplement at 4–5 (emphasis added).  If the Court sought to examine whether the Air Force violated the guidelines set forth in AFI 61-102, then the Court could do so merely by looking at the relevant guidance, which is included in the administrative record already.  *See* AR 515.  Thus, supplementing the administrative record is not "necessary in order not 'to frustrate effective judicial review'" of this matter.  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting *Camp v. Pitts,* 411 U.S. 138, 142–43 (1973).  Instead, allowing the declarations in would be close to second-guessing an agency's judgments, using information the agency did not have before it.  *See Metro. Interpreters & Translators, Inc. v. United States*, 145 Fed. Cl. 495, 506 (2019) ("The court has no need for independent calculations in order to determine whether the agency acted arbitrarily or capriciously, or abused its discretion.").  The Court declines to "'convert the "arbitrary and capricious" standard into effectively de novo review.'" *AgustaWestland*, 880 F.3d at 1331 (quoting *Axiom*, 564 F.3d at 1380).

### C. Whether Supplementing the Record is Necessary to Allow Effective Judicial Review of Kayhan's De Facto Debarment Claims

Plaintiff also claims that the declarations contain information regarding its lost opportunities since the non-award decision, which supports Plaintiff's claims with respect to a de facto debarment.  Pl. Mot. to Supplement at 5.  Plaintiff contends that "de facto debarments necessarily require extra-record support due to the very nature of the cause of action."  *Id.* at 6 (citing *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 129 (2010)).  Plaintiff explains that because there is no Administrative Record documenting a de facto debarment, this claim necessarily requires the information provided in the declarations.  *Id* at 6.  Further, because "the declarations detail a number of conversations between Government and Kayhan personnel, where Government officials provide first-hand information outside of the formal procurement setting

illustrating the cause of Kayhan's sudden and sustained halt in DoD awards," they are necessary for effective judicial review. *Id.* (emphasis omitted).

Defendant argues against Plaintiff's contention that this court "routinely" allows "supplementation to facilitate review of de facto debarment claims," and seeks to distinguish the present matter from prior cases where a motion to supplement was granted. Def. Resp. to Mot. to Suppl. at 6. Defendant points to jurisprudence concerning the sufficiency of the record for a claim of bad faith or bias as an appropriate comparator and argues that the "threshold" standard of "hard facts" to supplement the record in such a case should also be applied here. *Id.* (quoting *AvKARE, Inc. v. United States*, 124 Fed. Cl. 249, 252 (2015)). Finally, Defendant asserts that any portions of the declarations addressing de facto debarment are few and far between, containing much hearsay, speculation, and irrelevant narratives. *Id.* at 7–8. Defendant concludes that "Kayhan has not made a threshold showing that supplementation of the administrative record is necessary to consider its de facto debarment claim." *Id.* at 8.

Plaintiff is correct that, for adjudication of a de facto debarment claim, the administrative record may be supplemented. Indeed, the very nature of a de facto debarment claim seems to support allowing additional information regarding the circumstances into the record: after all, these claims often include allegations that an agency has relied on outside circumstances (previous agency action) while giving pretextual reasons on the record for its decision. *Cf. Galen Med. Assocs., Inc. v. United States*, 56 Fed. Cl. 104, 109 (2003), *aff'd*, 369 F.3d 1324 (Fed. Cir. 2004) (considering evidence outside of the administrative record because a "long pattern of questionable activity might be relevant to prove agency bias"); *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 129 (2010) (quoting *Beta Analytics Int'l, Inc. v. United States,* 61 Fed. Cl. 223, 226 (2004)) ("To be sure, the requisite clear and convincing evidence need not reside within the four corners

of the administrative record; such a requirement would turn the presumption of good faith into a foregone conclusion, save against 'officials who are both sinister *and* stupid.'"). In this case, the existing record would be "insufficient to permit meaningful review consistent with the APA" of Plaintiff's de facto debarment claim. *Axiom,* 564 F.3d at 1381.

Therefore, the Court permits supplementation of the record, but only with respect to those portions of the declarations relevant to a possible de facto debarment claim. These include: Declaration of Siamak Hesar ¶¶ 14–15; Declaration of Araz Feyzi ¶ 5; Declaration of Terence Bacon ¶ 3; Declaration of Andrew Melcher ¶ 3; Supplemental Declaration of Siamak Hesar ¶¶ 42, 65, 66–68; Supplemental Declaration of Araz Feyzi ¶ 59; Second Supplemental Declaration of Siamak Hesar ¶¶ 9–23; Third Supplemental Declaration of Siamak Hesar ¶¶ 3–5, 7–10. The Court will not permit supplementation with other parts of the declarations, which relate to the merits of Plaintiff's other claims, as the administrative record is sufficient to enter judgment with relation to them, and to do otherwise would be to invite *de novo* review. *AgustaWestland*, 880 F.3d at 1331 (quoting *Axiom*, 564 F.3d at 1380).

While the Court permits supplementation of those portions of the declarations relating to the de facto debarment claim, the Court must also evaluate the proffered declarations for whether they, in fact, bear any weight as relevant evidence. *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 281 (2024). The Court notes that several of the portions related to an alleged de facto debarment contain speculation, hearsay, or double hearsay. *See supra* Discussion III. To the extent that the aforementioned portions of Plaintiff's declarations contain inadmissible hearsay outside of a hearsay exception, the Court will not consider such statements. *See Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 256 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018); *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed. Cl. 347, 358 (2010), *amended on*

59

*reconsideration in part*, 98 Fed. Cl. 45 (2011); *Glob. Computer Enters., Inc. v. United States*, 88 Fed. Cl. 52, 70 (2009).  Furthermore, as the Court has noted, *see supra* Discussion III, to the extent that the declarations contain admissible non-hearsay or fall under a hearsay exception, this evidence is not nearly strong enough to meet Plaintiff's burden to prove de facto debarment.  *See NCL Logistics*, 109 Fed. Cl. at 613; *Madison Servs.*, 94 Fed. Cl. at 511.

### D. Whether Supplementing the Record is Necessary for Effective Judicial Review of Irreparable Harm

Plaintiff maintains that its declarations are necessary to support its claim of "the irreparable harm Kayhan would suffer in the absence of an injunction."  Pl. Mot to Supplement at 3. Defendant does not object to the use of declarations to address the injunctive relief factors but specifically opposes their use to determine the merits of the protest.  *See* Def. MJAR at 28, n.4. As Court finds that Plaintiff cannot prevail on the merits of its Motion for Judgment on the Administrative Record, *see supra* Discussion I–III, there is accordingly no need to supplement the record in order to examine the issue of irreparable harm.  *See Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1384 n.7 (Fed. Cir. 2022) ("Because we conclude that Mitchco has not shown success on the merits, we need not address its claim of irreparable injury.").

### V.  Injunctive Relief

The Court considers four factors when deciding whether to grant injunctive relief: (1) whether the plaintiff has succeeded on the merits, (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) whether the balance of hardships to the respective parties favors granting an injunction, and (4) whether the public interest is served by granting an injunction.  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).

The Court need not progress beyond the first factor because "[t]here can be no injunctive relief without a corresponding prevailing claim."  *Obsidian Sols. Grp., LLC v. United States*, 54

F.4th 1371, 1376 (Fed. Cir. 2022).  In other words, a "plaintiff who cannot demonstrate success upon the merits cannot prevail upon a motion for injunctive relief." *Insight Pub. Sector, Inc. v. United States*, 161 Fed. Cl. 760, 817 (2022) (quoting *By Light Pro. IT Servs., Inc. v. United States*, 131 Fed. Cl. 358, 367 (2017)); *see also Dell Fed. Sys.*, 906 F.3d at 999 ("[P]roving success on the merits is a necessary element for a permanent injunction.").  Accordingly, as Plaintiff's protest fails on the merits, Plaintiff is not entitled to injunctive relief.

## CONCLUSION

Accordingly, for the reasons stated above, the Court **DENIES** Kayhan's Motion for Judgment on the Administrative Record (ECF No. 41); **GRANTS** Defendant's Motion for Judgment of the Administrative Record (ECF No. 53); and **GRANTS IN PART** and **DENIES IN PART** Kayhan's Motion to Supplement the Unclassified Administrative Record (ECF No. 56).  The Clerk of Court is **DIRECTED** to enter Judgment accordingly.

The parties are directed to **CONFER** and **FILE** a Notice by June 10, 2026, attaching a proposed public version of this Sealed Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

IT IS SO ORDERED.



*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

May 28, 2026
Washington, D.C.

61